**John RANDALL, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 781 S 184.

Supreme Court of Indiana.

Nov. 17, 1983.

Susan K. Carpenter, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Latriealle Wheat, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

On January 16, 1981, following guilty verdicts rendered by a jury in the Vigo Circuit Court, Defendant-Appellant John Randall was sentenced by the trial court to imprisonment terms of sixty years for felony murder, thirty years for each of two class A felony robbery convictions, ten years for each of five class B felony criminal confinement convictions and thirty years for class A felony kidnapping. Said sentences were ordered to be served concurrently. Appellant now directly appeals and raises the following sixteen issues for our review:

1. denial of motion to suppress evidence obtained as a result of Appellant's allegedly illegal arrest;

2. denial of motion to suppress evidence based on allegedly improper identification procedures;

3. alleged prosecutorial misconduct;

4. denial of motion to dismiss based on Ind.R.Crim.P. 4(C);

5. prejudice to Appellant when ordered to appear in court in chains and irons;

6. impeachment of Appellant by his notice of alibi;

7. refusal to order the State to identify its confidential informant;

8. denial of motion for discharge based on failure of State to produce certain exculpatory evidence;

9. granting of State's motion *in limine* regarding testimony of one of its witnesses;

10. admission of State's exhibits 2 and 52;

11. permitting a State's witness to use an exhibit not introduced into evidence in a demonstration before the jury;

12. denial of Appellant's motion for continuance;

13. admission of certain evidence at sentencing hearing;

14. alleged improper sentencing on Counts I, II, and III;

15. alleged improper sentencing on Counts IV, V, VI, VII, and VIII, and

16. reasonableness of sixty year sentence for murder.

At approximately 5:15 p.m. on October 25, 1978, three men committed an armed robbery of Brock's Pharmacy, 3725 East 38th Street, Indianapolis. Said men were in the store for a period of about fifteen minutes. Pharmacist John Stockdale was fatally shot by one of the robbers in the rear of the store. The three men took money from the cash register with them when they left. They also forced employee Gary Szeszycki to tender certain drugs to them and they took him with them as a hostage. Szeszycki was later released in the store's parking lot. Defendant-Appellant John Randall, Clarence Randall and Anthony Peterson were identified by certain employees of Brock's Pharmacy as the men who committed the instant crimes.

I

Appellant first contends that the police did not have probable cause to arrest him and therefore any evidence obtained as a result of his arrest should have been suppressed by the trial court. Sergeant Fridenmaker of the Muncie Police Department received information from an informant about the person who killed the druggist in Indianapolis. Sergeant Fridenmaker stated that this informant had provided him with reliable information on seven to ten occasions over the preceding six years. The police already had descriptions of the perpetrators of the robbery in Indianapolis from the victims and knew that they were three black males carrying a pistol and a sawed-off shotgun. One of the perpetrators had an unusual protruding eye. The police also knew that the robbers had taken a number of drugs from Brock's Pharmacy. Indianapolis police officers went to Muncie and learned from the informant that he was in a poolroom with a friend who pointed out to him a man who "wasted the druggist in Naptown." The alleged killer had a weapon tucked into his trousers which the informant believed to be a blue steel, .38 caliber pistol. He saw the man get into a 1969 or 1970 gold-colored Cadillac with C.B. antennae and Indiana license plate number 45G2708. He said there were at least three or four other people in the Cadillac. The police first located said Cadillac in Muncie in front of a house occupied by a person known to Muncie police to be a drug addict. A check on the license plate revealed that it was issued to Anthony Peterson of Gary, Indiana. The police temporarily lost track of the Cadillac but found it within one-half hour in the parking lot of Robert's Downtown Inn in Muncie. The police learned that rooms 318, 317, and 313 were rented to people listing Gary addresses. Room 318 was rented to Anthony Peterson, Room 317 was rented to Loretta Randall and Room 313 was rented to Janice Randall. The central switchboard at the motel showed that telephone calls had been made between the three rooms. The police kept the motel under surveillance and once watched a black woman, Alberta Randall, come out to the "pop" machine and look "hard" at the police officers. She subsequently left the motel with a man who turned out to be Peterson. The police approached Peterson

who agreed to let Fridenmaker and Officer Popcheff search his room and automobile. The officers found sawed-off shotguns, syringes and shotgun shells in Peterson's car. The discovery of these items was not yet known by other officers who approached Room 317 with their guns drawn. They announced they were police and ordered the door open. Loretta Randall opened the door. When she and Clarence Randall stepped out of the room, Lieutenant Strode noted that Clarence Randall had a distinctive, protruding eye which fit the description of one of the robbers of Brock's Pharmacy. The officers then knocked on the door of Room 313. When Janice Randall opened the door, the police officers observed from the hall a black male lying on the bed with a hypodermic needle in his arm. Said male and Janice stepped into the hallway while the police made a cursory search of the room for weapons in case the man or woman were to dart back into the room. Janice and the man also needed to return to the room to dress. The man was Appellant. At that time, Appellant had a needle strapped to his arm and the officers observed syringes and drug bottles in plain view throughout the room; Appellant was arrested on a drug-related charge. While being held on the drug-related charge, Appellant was identified by Marjorie Carter and Karen Jeter as a participant in the Brock's robbery. They were working at the drugstore at the time of the robbery. Later that day an arrest warrant was issued charging Appellant with the murder of John Stockdale.

■ The State concedes that an arrest warrant based solely on the informant's information would have been inadequate but points out that the officers undertook surveillance and investigation which significantly supplemented the informant's information. At the time of Appellant's arrest, the police officers had substantial information which established underlying facts and circumstances indicating the trustworthiness of the information they received from the informant. When law enforcement officers rely upon a tip received from some third source, probable cause may be estab-

lished by verification of extrinsic facts which sufficiently demonstrate reliability of the tip. *Cato v. State,* (1979) 272 Ind. 102, 396 N.E.2d 119; *Pawloski v. State,* (1978) 269 Ind. 350, 380 N.E.2d 1230. The police knew that drugs had been taken from Brock's, that someone connected to the Cadillac in the motel parking lot was pointed out as the one who killed Stockdale, that the persons in the three motel rooms were together and that Clarence Randall fit the description of one of the perpetrators by reason of his protruding eye. The automobile also had been seen at the home of a known drug addict. Appellant cannot claim a violation of his own constitutional rights by showing that someone else had his constitutional rights violated. *Hope v. State,* (1982) Ind., 438 N.E.2d 273. Furthermore, the officers showed that when the door of Room 313 was opened, they could see from the hallway Appellant's possession and use of drugs and accordingly arrested him on drug charges at that time. The police had probable cause to arrest Appellant and Appellant's motion to suppress the evidence gained from that arrest was properly overruled.

II

■ Appellant next claims that eyewitnesses Carter and Jeter identified him by photographs and a line-up pursuant to procedures so unduly suggestive that their identification testimonies should have been suppressed. Appellant's main claim seems predicated upon Officer Moistner's testimony that when he took Carter and Jeter to Muncie, he told them that they were to make identifications of certain detained suspects. Since he used the word "suspects", Appellant argues that there was suggestiveness to the examination. When the witnesses were shown photos, however, there was no suggestion made to them about anyone being a suspect. There was a pattern of fifteen photographs set out on the desk and each witness was individually brought in and shown the photographs. They simply were told to look at all of the photographs to see if there was anyone they

could identify as one of the perpetrators of the robbery and murder. Both Carter and Jeter immediately identified Appellant. These witnesses also later identified Appellant in a line-up conducted in Indianapolis. There is no reference to any suggestion made by any of the police during the photo arrays or line-up which infers that there was undue suggestibility in the procedures followed. Appellant claims that the photos of himself, Clarence Randall and Anthony Peterson were obviously newer photos than the others in the array. Appellant also argues that before Carter and Jeter identified him in a line-up, there were photos in the newspapers identifying him as one of the perpetrators of these crimes. Witness Carter said that she had seen some photos in the newspapers but did not think that they looked like the perpetrators nor like the men she later picked out in the line-up. Furthermore, the witnesses testified that the store was well-lighted, that the perpetrators were in their presence for approximately fifteen minutes and that they were able to carefully observe them. Witness Carter had been a department store security officer and was particularly trained in identification procedures. She testified that she was aware that she might be called upon to identify these people and accordingly studied them for that purpose. There was no equivocation in the identifications by either Carter or Jeter from the first photo array in Muncie until their in-court identifications. Appellant's arguments only question the credibility of these witnesses. It should go without saying that a line-up or photo array cannot be done with perfection as it will often be true that photos are taken at different times and on different type paper and people of similar characteristics but not exact look alikes will be in line-ups. Perfect photo arrays or line-ups are not required. We find no merit to Appellant's contention that there was undue suggestibility to the identification procedures followed by these witnesses and accordingly find that the trial court properly overruled motions to suppress in regard to them.

### III

■ Appellant claims that the trial court erred by denying his motion to dismiss the charges against him based on a denial of due process of law due to prosecutorial misconduct. Appellant refers in his brief to his August 4, 1980, motion to dismiss which he concedes was primarily based on the right to a speedy trial pursuant to Ind.R.Crim.P. 4(C). He claims, however, that an alternative ground was alleged in his motion for dismissal and refers us to two paragraphs of said motion which read as follows:

"15. That the dismissal and refiling of information against the Defendant herein in the manner and fashion in which the State has so proceeded is contrary to I.C. 35–3.1–5 in that such dismissal and refilings are therein prohibited and further that such proceedings amounts to a unilateral amendment of the information in substance, to the prejudice of the Defendant.

16. That the information herein was improperly dismissed by the prosecution on three (3) separate occasions which improper dismissal is a bar to subsequent prosecution pursuant to I.C. 35–3.1–35–3–1–13(sic)."

Although these two paragraphs appear in said motion to dismiss, no mention was made of this ground for dismissal before the trial court. Appellant's only argument before the trial court was pursuant to Ind.R.Crim.P. 4(C). We further note in the above quoted paragraphs that the statutes were so incorrectly cited as to make it impossible to determine to what statutory law Appellant was referring. This situation was especially aggravated since Appellant did not explain in his memorandum or in his arguments before the trial court what issue he was making in those two paragraphs. He apparently meant to refer to Ind.Code § 35–3.1–1–13 (Burns 1979) which was repealed effective September 1, 1982, and replaced by Ind.Code § 35–34–1–13 (Burns Supp.1983). These statutes require a trial court to dismiss a case at any time prior to sentencing if the prosecuting attorney demands it. They further provide that when

"an order sustaining a motion to dismiss would otherwise constitute a bar to further prosecution of the crime charged, unless the defendant objects to dismissal, the granting of the motion does not bar a subsequent trial of the defendant on the offense charged." Ind.Code § 35–34–1–13(b) (Burns Supp.1983). Appellant does not raise any other grounds for finding the prosecutor's activity in dismissing and refiling the charges against Appellant on three different occasions to be a bar to further prosecution under this statute but rather concedes that the prosecutor had a right to refile the charges in this case. Appellant's only claim seems to be that the refilings caused delays which frustrated his speedy trial right. In the first place, Appellant's claim that he did not receive a speedy trial according to Ind.R.Crim.P. 4(C) must be tested under the requirements of that rule which consideration we take up in Issue IV. Secondly, since Appellant did not raise the issue of the impropriety of the prosecutor's activities in dismissing and refiling the charges before the trial court, we deem the issue waived. *Pounds v. State,* (1983) Ind., 443 N.E.2d 1193.

## IV

■ Appellant claims that he is entitled to discharge under Ind.R.Crim.P. 4(C). He originally raised this issue before the trial court on August 4, 1980. The record shows that Appellant was first charged in this case during October, 1978, and was tried on August 25, 1980. Although this is an unusual length of time from arrest to trial, the record shows many delays which Appellant occasioned by his motions for change of venue and continuance and by his changing attorneys several times. There also were occasions when the State delayed by dismissing and refiling the charges. Appellant asks us to review a rather complex record to arrive at his figure that more than a year passed which could not be attributed to him since the time he was charged and the time he was actually put to trial. We need not review all of these detailed occurrences, however. In regard to Ind.R.Crim.P. 4(C), this Court has stated:

"[W]hen, prior to the expiration of the period set by the rule, the court sets a trial date which is beyond that period and the defendant is or should be aware that the setting is beyond that period, it is his obligation to object at the earliest opportunity so that the court can reset the trial for a date within the proper period."

*Little v. State,* (1981) Ind., 415 N.E.2d 44, 46. If a defendant fails to voice a prompt objection, he is deemed to have waived the issue. *Little, supra; State ex rel. Engle v. Greene Circuit Court,* (1981) Ind., 421 N.E.2d 1108. Appellant concedes in his brief that the State had until July 4, 1980, in which to try him without violating Ind.R. Crim.P. 4(C). On June 16, 1980, the trial judge in open court set a tentative trial date for August 4, 1980. Neither Appellant nor his counsel voiced any objection to the trial date of August 4 at that time even though it was clearly beyond the July 4 deadline. On July 3, 1980, the trial court again reset the trial date for August 25, 1980. This was done in open court and in the presence of Appellant and his counsel and again no objection was voiced by Appellant or his counsel to call to the trial judge's attention that this date was beyond the deadline of July 4, 1980. Appellant waited thirty days until August 4, 1980, to file his motion for discharge. Appellant accordingly waived any error on this issue.

## V

■ Appellant next claims that the trial court committed reversible error by ordering him to return to the courtroom against his will wearing chains and irons in front of the jury. This episode took place during the afternoon of August 27, 1980. After the jury had been selected but before the State had begun to present its evidence, the trial court held a hearing outside the jury's presence to dispose of several pending motions and questions concerning specific trial procedures. Near the end of this hearing, Appellant became upset when the State failed to produce certain evidence and the trial court denied Appellant's request for a continuance until the State produced said

evidence. The trial judge rebuked Appellant and commented that it was his opinion that Appellant was just trying to stall the proceedings. Appellant reacted with the following trade:

"... What I'm saying, before the jury start, my trial start, they are going to have to bring this evidence in and there ain't going to be no trial. And that's all I've got to say. Then you can take me back over to the jail and lock me up and keep me there for the next ten years if you want."

Appellant then got up and went to another part of the courtroom causing his trial counsel to implore him to come back and sit down. Appellant Randall's dialogue in reply was:

"RANDALL: I don't want to hear it. They have got to bring this shit up there and you are going to say that— now, that all in the motions—

HAITH: [Defense counsel] He hasn't denied anything—

RANDALL: Yes he have, man, he has been denying shit all morning—

\* \* \* \* \* \*

RANDALL: You put the handcuffs on me and take me back to the jail. I'm not going to stay up in here. Now you either take me back or I'll go back by myself.

\* \* \* \* \* \*

RANDALL: (Inaudible) just railroad me like you did Peterson and my brother, I've got better sense than that."

A recess was called and defense counsel arranged for Appellant to talk to his family. After recess, the court reconvened out of the jury's presence and made the following record:

"COURT: John, I want you in the chair. All right, let the record show that the defendant has refused to come to trial. I have ordered him physically brought to trial by the Sheriff's Department in irons. And I have had him placed in the defendant's chair, still in irons."

Defense counsel then renewed his request for a continuance until the State produced the evidence requested. Said request was denied. At defense counsel's urging, the court addressed Appellant and the following exchange was recorded:

"COURT: All right. Show that we have got a, got Mr. Haith's request here. John do you want Aaron Haith to continue as your defense counsel?

HAITH: Speak so it can be picked up.

RANDALL: No.

COURT: Show that that's a negative. Do you want to continue in this case as your own attorney?

RANDALL: No.

COURT: Are you asking the Court to appoint you another attorney?

RANDALL: No.

COURT: Well what do you want?—Do you want, do you want to continue in this case today acting as your own attorney with Mr. Haith available to you for advise (sic)?

RANDALL: No. I'm not going to be my attorney no more. I filed motions and stuff, like I said they trying, they framed us up in the first place and now they don't want to bring up the evidence that they did find the fingerprints and then they are going to come in court and they ain't going to say— well we was charged with felony murder to have one witness now they are going to come to court and say they have got five goddamn witnesses. You crazy. And then you going to let them sit up there and do that mother fucking shit.

COURT: If you don't watch your language, I'll just gag you. You understand that?

RANDALL: Yeah, that is a violation of my Constitutional Rights.

COURT: That doesn't violate anybody's Constitutional Rights. You're not going to get, make this ah, circus out of this Court.

RANDALL: I ain't going to be railroaded either."

The trial court then proceeded with the rest of the preliminary hearing with Appellant

manacled, chained and refusing to participate. At the conclusion of the hearing and just prior to when the jury was brought into the courtroom, the trial court inquired of defense counsel as follows:

"COURT: Okay. Wait a second, Jane. Do you want me to make any comment about the defendant?

HAITH: Your Honor, I, of course, have to object to the jury seeing the defendant in this shape. Okay, I must do that for (inaudible) purposes. I have spoken to the defendant's cousin, S.T. Wimms, his sister Mary Wimms and his mother. They have asked that I continue if the Court so directs and I await the Court's instruction on that order.

COURT: How about—I would like, I would want you to continue in an advisory role, at least. And I want some advise (sic) now what you want me to tell that jury about his manacled condition.

\* \* \* \* \* \*

(ATTORNEYS AT BENCH)

COURT: Just withdraw, just show that Mr. Haith is not going to be here in an advisory role, he is going to be here as full counsel. And that the defendant indicates that he is going to stand mute. Do you want to make any statement to the jury about his manacled condition?

HAITH: Your Honor, I would like something to the effect that Mr. Randall has, neither the actions of Mr. Randall—result of his being in this condition should not effect (sic) their deliberation and consideration of the evidence in this trial as to whether he is guilty or innocent of the charges against him. And from that point I would like to be able to comment on in my own (inaudible)

COURT: So you do want me to make a statement?

HAITH: Okay, I'll try to keep it as good as I can. Okay, Jane, bring them in.

The jury was brought into the courtroom and the trial court made the following statement to the jury:

"COURT: Ladies and gentlemen, I would have to advise you that it is not customary for a defendant to be manacled in this Court. However at this time, due to the defendant's actions, I have had to order him manacled for this trial. And I would admonish you most strongly that this action has nothing to do whatsoever with the defendant's guilt or innocence. And that you may not, you absolutely must not take it into consideration this action that I have taken. And with that admonition I will turn the case over to the State for their opening argument."

Appellant concedes that the leading case concerning the constitutionally permissible methods of dealing with a disruptive and unruly defendant at trial is *Illinois v. Allen,* (1970) 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353. The United States Supreme Court therein stated:

"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."

*Allen,* 397 U.S. at 343, 90 S.Ct. at 1061, 25 L.Ed.2d at 359. Appellant now contends that the trial court should have taken Appellant out of the courtroom and out of the jury's presence instead of forcing him to sit before the jury manacled and chained to his

chair. Appellant specifically contends that it would have been less prejudicial to him to have been missing from the scene altogether as he requested than to be presented to the jury in chains and shackles.

The State contends that the trial court was put in the dilemma it was by Appellant's conduct and particularly by Appellant intermittently demanding to represent himself *pro se* while demanding representation by appointed counsel which he would complain about and request replacement for. The record bears out the State's contention and demonstrates the situation the trial court had to contend with. On June 13, 1979, attorney Wallace Weakley was appointed to represent Appellant. On November 26, 1979, Appellant requested a change of counsel but one week later withdrew that request and expressed his satisfaction with Weakley's representation. On January 29, 1980, Appellant persuaded the trial court to relieve Weakley from further duties and to allow Appellant to proceed *pro se*. Appellant again gained appointed counsel on April 3, 1980, by the appointment of attorney Aaron Haith. On June 12, 1980, Appellant again demanded to proceed *pro se* and renewed that demand on June 27, 1980. On July 3, 1980, the Vigo Circuit Court ruled that Appellant could proceed *pro se* with attorney Haith as co-counsel. On August 25, 1980, Appellant declared that he did not want representation by anyone. As indicated by the dialogue set out above following Appellant's outburst, Attorney Haith was declared advisory counsel and finally was declared full counsel. The trial court was placed in the position of having to decide whether to remove Appellant from the courtroom when he was demanding to represent himself, have Haith serve as advisory counsel or have Haith represent Appellant totally. Judge McQuillan expressed concern over having Appellant completely absent from the courtroom under these circumstances and also expressed concern about having Appellant gagged and bound so that he could not communicate with his attorney, particularly since he had taken such an active part in his defense on many occa-

sions. We will not, therefore, say that the trial judge abused his discretion by deciding to handle this very difficult situation in the way he did. It is clearly demonstrated that Appellant created the difficult situation by his own acts. He rejected the counsel of his own attorney and that of the court in their attempts to encourage him to cooperate and allow the trial to proceed in an orderly manner. We will not hear him complain that the decision forced upon the trial judge was improper. After the proceedings on August 27 had finished, the trial judge talked to Appellant and advised him that the court did not want to see him in irons again and assured him that if he would cooperate, it would not be necessary for him to be in irons the next day. The trial thereafter continued through September 5 without Appellant required to appear in irons. The trial judge did not abuse his discretion in dealing with this situation in the manner in which he did. We find no reversible error on this issue.

## VI

■ Appellant next claims that the trial court erred by permitting reference to Appellant's notice of alibi during his cross-examination and by admitting said notice of alibi into evidence. Appellant contends that it was improper for the trial court to allow him to be impeached on cross-examination with reference to statements in the Notice of Alibi filed as a pleading in this cause since said document, State's Exhibit 80, had been prepared and signed by Appellant's counsel and not by him personally. The first Notice of Alibi was filed by Appellant through attorney Weakley pursuant to Ind.Code § 35-5-1-1 (Burns 1979) [repealed effective September 1, 1982] on January 28, 1980. On August 21, 1980, attorney Haith filed a second Notice of Alibi to give "notice of intent to rely on alibi notice previously filed in this cause." The second Notice therefore brought the Notice of Alibi filed on January 28, 1980, into the present record and entered State's Exhibit 80 into evidence. The first Notice of Alibi recounted in detail Appellant's activities

during the night of the instant robbery and placed him in Lake County, Indiana. Appellant's direct testimony conflicted with many of the specific times, places and individuals alleged in the alibi notice and the State attempted to cross-examine him in relation to these conflicts. Appellant's objection was that the notice of alibi was a pleading required to establish an alibi defense and that the notice was neither certified to nor signed by Appellant personally and therefore could not be used by the State to cross-examine him. The State's position was that this was a pleading filed by Appellant by which Appellant stated that he was going to show that he was at the places at the times and in the presence of those individuals named in the pleading. The State argues that Appellant's own pleading made this information available to the trier of fact.

The trial judge decided that inasmuch as Appellant was before the jury testifying as to his whereabouts and his activities, the State should be allowed to impeach him by his conflicting statements in regard to the same time period. We agree with the trial judge. The notice of alibi is given by a defendant for purposes of permitting him to bring forth evidence in his defense to show that he was at another place and involved in other activities at the time the crime was committed. Ind.Code § 35–5–1–1 does not require the notice of alibi to be verified or to be signed by the defendant. It is nonetheless his statement and is voluntarily filed by him. Appellant relies on *Ashby v. State,* (1953) 232 Ind. 287, 112 N.E.2d 290. The question in *Ashby* arose, however, when the prosecuting attorney attempted to examine the defendant as to what he told his attorney about his whereabouts on the night of the crime. Here, Appellant was being cross-examined about statements of fact he made in the notice of alibi and statements of fact he was making in court that were in conflict. The trial judge decided that if reference was being made to the document, it was proper to admit it into evidence and the fact that Appellant claimed that he did not remem-

ber anything about it went only to its weight and not to its admissibility.

Appellant claims that since he was required to file the notice of alibi in order to present that defense, his situation is analogous to testimony given in response to the grant of use immunity. Testimony induced as a response to the grant of use immunity is testimony given by a witness that is of no benefit to him or his purposes and is required of him with immunity from its use against him at a later time. Such is not the case with a notice of alibi. A notice of alibi is filed by the defendant so that he might present evidence which he claims to be true and which he contends will prove that he could not have committed the crime as the State charged. The notice is to give the State sufficient time in advance of trial to prepare to respond to that evidence. The notice requirement does not require Appellant to give evidence he does not wish to give but requires only that he state in a pretrial pleading certain facts that he claims to be true and that may be proved by the evidence he presents during trial. We do not find that the trial judge erred by permitting Appellant's impeachment by statements made in his Notice of Alibi when said statements were in conflict with statements he was making in his direct testimony before the jury. The trial court did not err by admitting this pleading into evidence.

### VII

Appellant next contends that the trial court erred by refusing to order the State to disclose prior to trial the identity of its confidential informant. Appellant claims that said disclosure was essential to the fair determination of whether the police had probable cause to arrest him and to search him when arrested. He specifically contends that he needed to know the identity of the informant to determine the informant's credibility and what the informant told the police which was absolutely critical to a resolution of this issue. It is well settled that the general rule regarding the disclosure of the identity of an informant at

trial by the State is one of non-disclosure and that the burden is upon the defendant seeking disclosure to demonstrate an exception to the informant's privilege to remain anonymous. To carry this burden, the defendant must show that the identity of the informer or the content of his communication is relevant and helpful to the accused's defense or is essential to the fair determination of the cause. *Lewandowski v. State,* (1979) 271 Ind. 4, 389 N.E.2d 706, *McCulley v. State,* (1971) 257 Ind. 135, 272 N.E.2d 613. We previously recited in this opinion (Issue I above) that the State conceded that information given by the informant alone did not constitute sufficient probable cause for the police to arrest and charge Appellant. We also indicated, however, that the police further investigated and conducted surveillance after learning of the information given by the informant and became aware of other facts that sufficiently gave them probable cause. Appellant does not show that the informant's identity was essential to a fair determination of his cause such that a balancing of the respective interests of the State and Appellant mandated disclosure. *Lewandowski, supra.* There was no error in the trial court's refusal to order disclosure of the confidential informant's identity.

### VIII

■ Appellant also contends that the trial court erred by refusing to dismiss the charges against him due to the fact that a notebook belonging to him and removed by police during the search of his hotel room was unavailable at trial. Appellant, Clarence Randall and Anthony Peterson were charged for the robbery and murder at Brock's Pharmacy. Apparently these three men were engaged in prescription "busting." This involved the obtaining of drugs from various drugstores throughout the State by using forged prescriptions. Appellant's said notebook contained a list of specific drugstores with the names used to obtain prescriptions in each, the dates the prescriptions were filled and the next renewal date for each prescription refill. This notebook apparently was used regular-

ly by Appellant and his cohorts to call on these drugstores to obtain drugs. They used the drugs personally or sold them at a profit on the streets of Gary.

Appellant contends that this book would show that he and his cohorts had never done prescription "busting" at Brock's Pharmacy in Indianapolis. It further would show that they did prescription "busting" in Indianapolis drugstores on October 26, 1978, the day after the robbery and murder at Brock's Pharmacy. Appellant's argument is that the notebook would prove that he was never at Brock's Pharmacy, that he did not need to commit the instant robbery and murder to obtain drugs, and that he did not commit the instant crimes since it would be unlikely that he would come back into Indianapolis to "bust" prescriptions in other drugstores during the next day. The State offered to stipulate that Brock's Pharmacy was not mentioned in the notebook and that the book contained references to October 27, 1978. Appellant did not agree to the stipulation. Police Officer Jack Sandlin acknowledged that he used a notebook during the investigation and specifically testified that said notebook included references to prescriptions passed on October 26, 1978, and included no references to Brock's Pharmacy. Appellant also testified about the existence of the notebook, its contents and use, the absence of references to Brock's Pharmacy and the listings in the notebook for October 26, 1978. The State acknowledges that negligent destruction or withholding of material evidence by law enforcement officers or the prosecution may constitute grounds for reversal. This is true. *Rowan v. State,* (1982) Ind., 431 N.E.2d 805, *reh. denied; Birkla v. State,* (1975) 263 Ind. 37, 323 N.E.2d 645, *cert. denied* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77; *Hale v. State,* (1967) 248 Ind. 630, 230 N.E.2d 432. The State contends, however, that Appellant was able to get into evidence everything he claims the book would have proven. Furthermore, the State points out that there was no request made for the production of this notebook until very late in the trial.

The State commenced presenting evidence on August 26, 1980, and continued presenting evidence on August 27, 28, and 29. Appellant presented evidence on August 29, September 2 and September 3. Not until court reconvened after lunch on September 3 did Appellant raise any issue concerning the absence of the notebook. At that time he demanded dismissal of the charges and discharge due to the unavailability of the notebook. No reference to the notebook nor demand for its production had been made until that point. This was particularly significant since Appellant's trial was the third of three trials based upon the robbery and murder at Brock's Pharmacy. Certain exhibits were in possession of a Hamilton County court where Anthony Peterson was tried and exhibits necessary for the Hamilton County trial previously had surfaced in the Vigo Circuit Court proceedings involving Appellant. Police and prosecution were not given sufficient time to make a search for the notebook at the late date on which it was requested. The State therefore agreed to stipulate as to its contents and permitted Officer Sandlin to testify, as noted above, that he agreed with certain matters in the book about which Appellant testified. The State permitted Appellant to testify about its contents without contradiction. Appellant did not accept the offer of stipulation. The trial court denied the motion for dismissal of the charges on these grounds stating:

"Well I just don't feel as though he is entitled to a discharge on, on this item of evidence. What it proves, if were, if it were in the evidence it would prove that they had never, that is the group of them had never done any prescription busting at Brock's, it might tend to prove that but I don't see where it tends to prove or disprove the fact that of a robbery.

*  *  *  *  *  *

I'm going to deny your motion and try to give you whatever support I can in getting what the book contained into the evidence in front of the jury here."

There is no showing here that the State withheld material evidence or negligently destroyed this notebook. The fact is that the notebook was not physically available when Appellant requested it. We agree with the trial judge that it did not require Appellant's discharge. Appellant was able to establish what he claimed the notebook would prove without contradiction and he therefore was not prejudiced nor put in a position of grave peril. We find no error on this issue.

IX

Appellant next contends that the trial court erroneously denied him the opportunity to impeach Marjorie Carter in regard to the charges she caused to be filed against Isaiah Chunn. Apparently Carter had filed a report with the police some time prior to this incident causing criminal charges to be filed against Chunn. For reasons not furnished to us in the record or briefs, these charges were later dismissed. The trial court granted the State's motion *in limine* prohibiting Appellant from discussing the facts surrounding Carter and Chunn. Notwithstanding, Appellant attempted to show the court that Carter had brought charges against Chunn which were disposed of by dismissal. He requested that he be able to bring this into evidence to impeach Carter and to show that her credibility was in question in bringing the instant charges against him.

Appellant concedes that it is a well established rule that a witness cannot be impeached by specific events of misconduct which have not resulted in criminal convictions. Impeachment must be done, if at all, by proving the witness' general reputation in the community for being dishonest. *Swan v. State,* (1978) 268 Ind. 317, 375 N.E.2d 198; *Morris v. State,* (1977) 266 Ind. 473, 364 N.E.2d 132, *cert. denied* 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462. The same argument posited by Appellant was made in *Swan, supra.* This Court there held that similar evidence was properly excluded because a witness cannot be impeached by proof of particular extraneous acts of misconduct which have not been reduced to convictions. The same ruling was made in

*Banks v. State,* (1976) 265 Ind. 71, 351 N.E.2d 4, *cert. denied* (1977) 429 U.S. 1077, 97 S.Ct. 821, 50 L.Ed.2d 797, after that trial court barred evidence that two of the witnesses who were police officers were under investigation for alleged misconduct. The evidence here does not even show that Carter's actions in filing charges that were later dismissed was misconduct. There are many reasons for dismissing a criminal case other than misconduct by the prosecuting witness. Whatever the reason, it was not the proper subject for attacking Carter's credibility and the trial court properly excluded it.

## X

■ Appellant next claims that the trial court erred by admitting Exhibits 2 and 52 into evidence as offered by the State. Said Exhibits were shotguns found by police officers in the trunk of Anthony Peterson's automobile on the morning of October 27, 1978. Witness Marjorie Carter testified that Exhibit 2 looked like the sawed-off shotgun which Appellant shoved at her face during the robbery. John Patton testified that Exhibit 2 resembled the sawed-off shotgun which a robber at the front of the pharmacy carried during the robbery. This was sufficient authentication for admission of the exhibit. *Wilson v. State,* (1978) 268 Ind. 112, 374 N.E.2d 45.

■ The State admits that there is no evidence directly linking Exhibit 52 to the commission of the robbery and murder at Brock's Pharmacy. The State contends, however, that Appellant's substantial rights were not prejudiced by the admission of Exhibit 52 and that any error attending said admission was harmless. *Wells v. State,* (1982) Ind., 441 N.E.2d 458, *reh. denied* (1983). Furthermore, the State contends that any error committed by admitting this evidence must be harmless since other evidence having the same probative value was admitted without objection. *Badelle v. State,* (1982) Ind., 434 N.E.2d 872. The State specifically points out that Anthony Peterson's statement recounting how Appellant and Clarence Randall had two sawed-off shotguns with them on the trip from Gary was admitted without Appellant's objection. Sergeant Fridenmaker described finding two sawed-off shotguns in Anthony Peterson's car; an inventory was admitted into evidence listing the two sawed-off shotguns described as items 2 and 3. After the admission of Exhibit 52, Officer Strode testified about statements made to him by Appellant concerning Exhibit 52. Appellant testified that he had two sawed-off shotguns with him on the trip from Gary. Accordingly, we find that Exhibit 52 was only demonstrative of evidence already admitted without objection. We agree with the State that any error committed with regard to Exhibit 52 was harmless under all the facts and circumstances here. There was, therefore, no reversible error in the admission of Exhibits 2 and 52 into evidence.

## XI

■ During the direct examination of Marjorie Carter, she was asked to identify State's Exhibit 2 which had not yet been offered into evidence. Carter said Exhibit 2 looked like the gun that one of the robbers had pointed at her. She was then asked to demonstrate with the exhibit exactly what the robber did with the gun as he came up to her. Defense counsel was given permission to ask preliminary questions of the witness and he asked her if she could identify said weapon. Carter said that it looked like the gun that was pulled on her but she could not be certain that it was the same gun. Appellant then objected to any demonstration including Exhibit 2 because of the tenuous identification of it. The trial court overruled the objection and permitted Carter to demonstrate with the weapon. It was difficult for her to do so because the gun was too heavy for her to handle.

This Court has stated:

"The decision to permit or refuse to permit a courtroom demonstration is a matter of trial court discretion which this court will not disturb on appeal unless there is a clear abuse of discretion."

*Mitchell v. State,* (1978) 270 Ind. 4, 6, 382 N.E.2d 932, 933. There is no showing here that the trial court abused its discretion by permitting Carter's demonstration. Furthermore, State's Exhibit 2 was subsequently admitted into evidence during the testimony of Officer Cox. There is therefore no merit to Appellant's contention that the trial court committed reversible error on this issue.

### XII

■ Appellant further contends that the trial court erred by denying his motion for continuance which apparently was based on Appellant's contention that the State failed to comply with a discovery order. This issue was in conflict since the State denied that it failed to comply with any discovery order. The August 25 trial date was set on July 3, 1980. There is no showing that Appellant raised any issue concerning discovery until just prior to trial on August 25. Defense counsel then informed the trial court that Appellant was not sure whether Officer Schacht had given certain testimony at a prior hearing in Hamilton County. Specifically, Appellant was not sure at which hearing the testimony might have been given but believed that the State had not provided him transcripts from all prior hearings. The trial judge refused to grant a continuance stating: "... I don't think a continuance is in order at this time to review a transcript that nobody is very sure about." Defense counsel responded: "I would ask that in the alternative, if the Court isn't inclined to grant the continuance, that the State make available that transcript at its earliest possible time." Appellant's motion was granted and the prosecution assured the trial court that it would review its files to determine which transcripts it had and would furnish all to Appellant. Officer Schacht did not actually testify until three days later.

Appellant now does not show how he was harmed by the trial court's action particularly when he agreed to the alternative action finally taken by the trial court. The trial court could not be expected to give a continuance for production of some exhibit that may or may not exist, especially when the motion for production was made on the morning of trial. The problem presented to the trial judge was compounded by Appellant's tendency to make oral motions on his own over and above action taken by his counsel and to argue with the trial judge and his attorney regarding the subjects of these motions. There is no showing that Appellant was not given an opportunity to fully examine all witnesses with regard to evidence and exhibits admitted by and through them and no prejudice is shown by Appellant on this point. We find no error.

### XIII

■ Appellant claims that the trial court committed reversible error by admitting the testimony of State's witness Thurman Miller at the sentencing hearing on December 10, 1980. When Miller testified that he was a pharmacist in Terre Haute and was a member of several state pharmaceutical organizations, Appellant objected to his testifying further on the grounds that Miller could not testify in any relevant manner about the crime committed or about Appellant's character or background. The trial judge indicated that those concerns would go to the weight of Miller's testimony and that the trial judge could review said testimony and determine whether or not it was relevant. He accordingly overruled the objection and permitted Miller to testify. Miller's complete testimony was that he was aware that pharmacists throughout the state were taking additional security measures because of Stockdale's murder by lawfully having weapons with them in their drugstores to protect themselves. The sentencing hearing was then continued to January 16, 1981. The State made no reference to Miller's testimony during the hearing. Defense counsel objected to the fact that the trial court heard Miller's testimony stating that Appellant did not consider it proper with respect to any possible aggravating or mitigating circumstances. The trial judge stated that he agreed with the defense and further stated

that he did not consider Miller's testimony in making his findings of aggravating circumstances and in determining Appellant's sentence. He stated that the aggravating circumstances that he took under consideration were taken from the pre-sentence investigation and the testimony that he heard during Appellant's trial. In sentencing Appellant to sixty years for murder, the trial judge indicated that his reasons were based on Appellant's prior criminal record and his tendency toward violence which was apparent in the presentence report and the trial of this cause. We find no error on this issue. Although it appears that Miller's testimony was not relevant to Appellant's sentencing, the trial court acknowledged that this was so and further indicated that it did not use that evidence in arriving at a sentence. The trial judge gave reasons for Appellant's sentences based on the facts of this case and the facts contained in the pre-sentence report that adequately justified the sentences arrived at. If any error was committed, it was harmless error and does not justify a reversal of Appellant's convictions.

### XIV

■ Count I charged Appellant with felony murder in that Appellant killed John Stockdale while committing robbery. Count II charged Appellant with the robbery of both Marjorie Carter and Karen Jeter and further alleged that while doing so, Appellant committed serious bodily injury upon John Stockdale thereby making the robbery a class A felony. Count III charged Appellant with committing a robbery upon Gary Szeszycki in that drugs were taken from him by putting him in fear through the use of a deadly weapon and that while doing so, Appellant committed a serious bodily injury upon John Stockdale thereby making this robbery a class A felony. Appellant was found guilty by the jury of all three of these counts in addition to others. He was sentenced to a term of sixty years on Count I and to separate terms of thirty years for Counts II and III. Appellant was actually found guilty of all nine counts for which he was charged and all sentences were ordered to be served concurrently. Appellant now claims that he should not have been sentenced by the court on Counts II and III, the class A felony robbery counts, since there was actually only one robbery and since both of the robbery counts constituted the underlying felony upon which the felony murder count and conviction were based. The State concedes that Appellant is correct pursuant to *Williams v. State,* (1979) 271 Ind. 656, 395 N.E.2d 239, but asks us to reconsider *Williams.* In *Williams,* we held that when the property of a business establishment is taken from several employees of the business, such as was done here, the robbery amounts to one robbery and not a robbery against each of the employees. *See also Lash v. State,* (1982) Ind., 433 N.E.2d 764; *Lane v. State,* (1981) Ind., 428 N.E.2d 28. There is no evidence here that any personal property was taken from Carter, Jeter or Szeszycki; only property belonging to the owners of Brock's Pharmacy was taken. The rule in *Williams* therefore applies and there was only one robbery. We also have held that a sentence for both felony murder and for the underlying felony is a violation of the double jeopardy clause. *Mitchell, supra.* Since Appellant was found guilty under Count I for felony murder in that he killed while in the perpetration of robbery, he should not have been separately sentenced for the included robbery. It was improper for the trial court to sentence Appellant under Counts II and III and those sentences are accordingly ordered vacated.

### XV

■ Appellant was charged, convicted and sentenced in separate counts for the confinement of Marjorie Carter, Karen Jeter, John Patton, Keith Harvison and Deborah Ewing. Appellant now asks us to apply our holding in *Williams* and find that there was only one confinement. We rejected Appellant's contention in *Young v. State,* (1980) Ind., 409 N.E.2d 579. Young took money belonging to a motel and a gun belonging to an employee of the motel. We found in that case that there were two

separate robberies, one being of the motel and the other being of the person of the employee. The State is correct in its contention that Appellant committed confinement as to each of the five persons in the drugstore, both employees and customers. This was a personal crime committed upon each of these persons and the trial court properly entered judgment and sentenced Appellant on each of the five counts of confinement.

## XVI

Appellant finally contends that the sixty year sentence for felony murder was manifestly unreasonable under the circumstances. Ind.Code § 35–50–2–3(a) (Burns 1979) prescribes a sentence of forty years upon conviction of murder to which not more than twenty years may be added for aggravating circumstances and not more then ten years subtracted for mitigating circumstances. In sentencing, the trial judge stated that he heard no testimony indicating any mitigating circumstances in this case. The trial court further found that Appellant had "Participated in a life of crime all of [his] adult life." Ind.Code § 35–4.1–4–7(c)(2) [§ 35–50–1A–7(c)(2) (Burns 1979)] specifically lists a history of criminal activity as an aggravating circumstance. The pre-sentence investigation report outlined Appellant's lengthy history of criminal activity. Appellant admitted that he was a drug user and dealer and a car thief. There was ample evidence in the record to support the trial judge's finding that Appellant had participated in a life of crime which is a proper aggravating circumstance. In view of the facts and circumstances already detailed in this opinion, we do not find a sentence of sixty years to be manifestly unreasonable.

This cause is remanded to the trial court with instructions to vacate the sentences imposed for class A felony robbery in Counts II and III. The trial court is in all other respects affirmed.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.