# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GARY R. ROM**
Deputy Attorney General
Indianapolis, Indiana



FILED
Sep 24 2012, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

GREGORY KIRK,                              )
                                          )
    Appellant-Defendant,                  )
                                          )
       vs.                              )    No. 49A02-1110-CR-979
                                          )
STATE OF INDIANA,                          )
                                          )
    Appellee-Plaintiff.                   )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven R. Eichholtz, Judge
Cause No. 49G20-1006-FB-48834

**September 24, 2012**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Gregory Kirk ("Kirk") appeals from his convictions following a jury trial for conspiracy to commit dealing in cocaine[1] as a Class B felony, conspiracy to commit dealing in a controlled substance[2] as a Class B felony, neglect of a dependent[3] as a Class C felony,[4] and possession of marijuana[5] as a Class A misdemeanor. On appeal, Kirk raises the following consolidated and restated issues:

I. Whether the trial court abused its discretion in admitting incriminating statements about Kirk, which were made to police by Kirk's stepson, D.K.;

II. Whether the trial court abused its discretion in admitting evidence obtained during a warrantless search of Kirk's cell phone, which Kirk alleges was obtained in violation of the Fourth Amendment to the United States Constitution and Article I, section 11 of the Indiana Constitution;

III. Whether the search of Kirk's home violated the Fourth Amendment to the United States Constitution and Article I, section 11 of the Indiana Constitution, because the search warrant was not supported by probable cause;

IV. Whether the trial court abused its discretion when it admitted the search warrant into evidence; and

V. Whether there was sufficient evidence to support Kirk's convictions.

We affirm in part, reverse in part, and remand with instructions.

---

[1] *See* Ind. Code § 35-41-5-2; Ind. Code § 35-48-4-1.

[2] *See* Ind. Code § 35-41-5-2; Ind. Code § 35-48-4-2.

[3] *See* Ind. Code § 35-46-1-4.

[4] Kirk was charged with neglect of a dependant as a Class D felony in Count III of his information. The behavior described in Count III, however, alleged an offense that, if properly classified, would have been a Class C felony. Ind. Code § 35-46-1-4(b)(1). In a pre-trial order, the trial court noted this typographical error and stated that the offense was in fact a Class C felony. *Appellant's App.* at 123. Kirk was convicted of Class C felony neglect of a dependent. *Id*. at 27.

[5] *See* Ind. Code § 35-48-4-11.

## FACTS AND PROCEDURAL HISTORY

During June 2010, Dennis Barnett ("Barnett") lived in the 800 block of North Tuxedo Street in Indianapolis. At that time, Barnett, a long-time drug user, was buying $20 to $40 worth of crack cocaine every other day from Kirk's sixteen-year-old stepson, D.K. Barnett was unable to text from his cell phone, so when he needed drugs he would knock on the door of D.K.'s house, which was located at 918 North Tuxedo Street. Occasionally, when Barnett did not have the cash to pay for the cocaine, D.K. "fronted [Barnett] until the next day." *Tr*. at 84. Both Barnett and D.K. kept track of the cocaine Barnett purchased and any money that Barnett owed. Kirk was sometimes present when Barnett bought cocaine from D.K., and would request cocaine from D.K. or Barnett for his own use.

On or about the evening of June 18, 2010, Barnett promised Kirk $20 if he would drive him to collect $80 from a man who owed him money. When they arrived, the man did not have cash so Barnett accepted payment in the form of $80 worth of crack cocaine. Kirk asked Barnett to give him $20 worth of cocaine as payment for the drive, instead of the previously agreed $20 in cash. *Id*. at 104. On the drive back, Kirk talked to Barnett "about money he [Barnett] owed [Kirk's] son," for previously purchased drugs. *Id*. at 114. Upon returning home, Kirk told D.K. that Barnett owed D.K. money and that Barnett was currently in possession of crack cocaine. *Id*. at 93. That evening, D.K. and an unidentified man went to Barnett's house. Barnett testified that he had smoked all of the cocaine before the men got there. The men left Barnett's home without incident.

On June 19, 2010, Barnett walked by Kirk's home on his way home from work.

3

Upon seeing Barnett, Kirk said, "You are going to get beat down." *Id*. at 90, 96. Later that evening, Barnett saw Kirk and D.K. across the street near his house. D.K. had a gun in his hand, which was pointed at the ground. Kirk was standing beside D.K., and the two were "talking towards [Barnett] down the street." *Id*. at 98. At trial, Barnett testified that he heard Kirk yell, "We going to get him." *Id.* at 97. Assuming that Kirk and D.K. were there to collect on the debt they believed Barnett owed for a prior cocaine purchase, Barnett called 911.

Indianapolis Metropolitan Police Department ("IMPD") Reserve Officer Alan Nelson ("Officer Nelson") responded to the call, and after Barnett provided a description of the suspects and the direction they were headed, Officer Nelson apprehended Kirk and D.K. about fifty or sixty yards from Barnett's house. Additional IMPD officers, including Detective Garth Schwomeyer ("Detective Schwomeyer"), arrived shortly thereafter.

For officer safety, and in an attempt to control the situation, Officer Nelson patted down the suspects for weapons. The pat-down of D.K. revealed that he was carrying a loaded, semi-automatic, Cobra 380 handgun. The gun had been reported stolen in 2009. D.K. was arrested for possession of a handgun without a license. Police then handcuffed him and advised him of his *Miranda*[6] rights. Although one of the officers determined that D.K. was only sixteen-years old, he was not informed of his rights under Indiana Code section 31-32-5-1, which pertains to a juvenile's waiver of his right against self-incrimination. A search incident to arrest revealed that D.K. had a baggie of cocaine in

---

[6] *Miranda v. Arizona,* 384 U.S. 436 (1966).

his front pocket, $120 in cash, and, in his back pocket, eighteen pills of acetaminophen with codeine in a pill bottle bearing the name "Richard Dodd." *Id*. at 126-27. After he was arrested, D.K. made incriminating statements about Kirk to police.

After noticing that Kirk's eyes were glassy and bloodshot, his speech was slurred, and his breath had an odor of alcohol, Detective Schwomeyer arrested Kirk for public intoxication and for neglect of a dependent and advised him of his *Miranda* rights. During a search of Kirk incident to arrest, police found half-burnt marijuana cigarettes, "roach clips," a pipe, and a cell phone. *Id*. at 141. Detective Schwomeyer immediately pressed the text button on the cell phone and looked at six to eight text messages. He recalled that one text message was from "someone requesting to purchase marijuana, and [another] one was someone requesting to purchase pain pills." *Id*. at 180. Officer Nelson also looked at the text messages. While Officer Nelson did not recall the exact language of the text messages, he recalled that they were from "people wanting to buy drugs," *i.e.*, "pills" and one other drug that Officer Nelson could not remember. *Id*. at 129. When questioned at the scene, Kirk told Detective Schwomeyer that he had been near Barnett's house because "the guy owed him money." *Id*. at 229. When asked about the nature of the debt, Kirk declined to answer. *Id*.

On June 23, 2010, Detective Schwomeyer obtained a warrant to search the home at 918 North Tuxedo Street, the address both Kirk and D.K. gave as being their residence. *Id*. at 200. That same day, officers executed the search warrant and found a duffle bag in a wooden box on the outside back porch. Attached to the duffle bag was a cardboard tag with D.K.'s name on it. *Id*. at 195-97. Under the duffle bag, Detective Schwomeyer

5

found a Mossburg .22 caliber full tactical rifle. *Id*. at 196. Detective Schwomeyer testified that the duffle bag contained a sawed-off 12-gauge shotgun; 200 to 300 rounds of different kinds of ammunition; 1000 small, plastic, zip-lock baggies; a set of digital scales; a shoulder holster for a semi-automatic 380; a couple of BB guns; and a bottle of injectable lidocaine. *Id*. Inside the home, police found $388 in cash inside a backpack, which was in the closet of the bedroom that D.K. shared with his younger brother. *Id*. at 232. In that same bedroom, police found a gun cleaning kit for an M-16 rifle. *Id*. at 197.

Kirk was charged with conspiracy to commit dealing in cocaine, conspiracy to commit dealing in a controlled substance, neglect of a dependent, and possession of marijuana. Prior to trial, Kirk sought to suppress: (1) statements D.K. made to police; (2) evidence obtained from the search of Kirk's cell phone; and (3) evidence found during the search of his home. After a hearing on the motion, the trial court denied the motion to suppress. Kirk filed a motion to reconsider. It is not clear from the record before us whether that motion was ever ruled on by the trial court.

Kirk's two-day jury trial began on September 14, 2011. On the first day of trial, Kirk raised a motion in limine: (1) to exclude evidence that a confrontation had occurred between Barnett and Kirk a couple of days prior to Kirk's arrest; (2) to exclude D.K. as a witness because Kirk alleged that D.K. was called as a witness by the State for the sole purpose of later impeachment; and (3) to exclude Detective Schwomeyer's testimony regarding the content of the text messages on Kirk's cell phone. *Id*. at 49-58. The trial court denied the motion in limine, but indicated it would "entertain an objection at the appropriate time and rule on it then." *Id*. at 64.

6

During trial, defense counsel again objected to the admission of D.K.'s statements on the basis that they were taken in violation of Indiana Code section 31-32-5-1, and also objected on the basis that they were hearsay. Over defense counsel's objections, the trial court admitted the evidence of D.K.'s statements and the evidence discovered during the search of both Kirk's cell phone and his home. *Id.* at 128-30, 171-74, 177, 180, 186-88, 194, 201, 211. Kirk was convicted of all four counts and was sentenced to eighteen years, with ten years executed and eight years suspended to probation for each Class B felony conspiracy conviction; four years executed for the Class C felony neglect of a dependent conviction; and one year executed for the Class A misdemeanor possession of marijuana conviction, all of which were ordered to run concurrently. Kirk now appeals.

## DISCUSSION AND DECISION

### I. Admission of D.K.'s Statements

Kirk argues that the trial court abused its discretion in admitting incriminating statements D.K. made about Kirk to police. Specifically, Kirk contends that the statements should not have been admitted into evidence because they were taken by police in violation of Indiana Code section 31-32-5-1 and because the statements constituted inadmissible hearsay. The trial court has broad discretion in ruling on the admission or exclusion of evidence. *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). The trial court's ruling on review of admissibility of evidence will be disturbed only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Oatts v. State,* 899 N.E.2d 714, 719 (Ind. Ct. App. 2009). In reviewing the

7

admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the appellant's favor. *Redding v. State*, 844 N.E.2d 1067, 1069 (Ind. Ct. App. 2006). As a rule, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Id*. In determining whether an evidentiary ruling affected a party's substantial rights, we assess the probable impact of the evidence on the trier of fact. *Id*.

## A. D.K.'s Statements

The statements to which Kirk objects were introduced at trial through the testimony of Detective Schwomeyer, who stated:

> I asked [D.K.] why was he out here dealing cocaine and carrying a pistol, sixteen years old. His response [was] that times were tight, that he had to help out the family, said there wasn't food in the house. I asked him, you know, that doesn't give you any right to be out here, you are sixteen years old, and you have got a loaded gun, carrying a gun, selling cocaine and selling pills. And he said, "But I'm with my dad," which shocked me.

*Tr*. at 174.

## B. Indiana Code Section 31-32-5-1

Under the Fifth Amendment to the United States Constitution and Article I, Section 14 of the Indiana Constitution, "persons shall be free from being compelled to make disclosures which might subject them to criminal prosecution or aid in their conviction." *P.M. v. State*, 861 N.E.2d 710, 713 (Ind. Ct. App. 2007). In protection of the right against self-incrimination, the United States Supreme Court's opinion in *Miranda v. Arizona,* 384 U.S. 436, 444 (1966) established that "'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial

interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *P.M.*, 861 N.E.2d at 713. (quoting *Miranda*, 384 U.S. at 444). Such procedural safeguards include an advisement to the accused that he has the right to remain silent. *Id.*

The United States Supreme Court has made clear that "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *United States v. Patane*, 542 U.S. 630, 641 (2004). "This, of course, follows from the nature of the right protected by the Self-Incrimination Clause, which the *Miranda* rule, in turn, protects. It is 'a fundamental *trial* right.'" *Id.* (quotations omitted) (emphasis in original). Once a statement has been improperly obtained, the violation can be remedied by prohibiting the use of the involuntary statement "against *that person* in a criminal prosecution." *D.M. v. State,* 949 N.E.2d 327, 333 (Ind. 2011). Both parties agree that D.K. was read his *Miranda* rights.

In 1972, the Indiana Supreme Court "responded to the U.S. Supreme Court's admonition that 'special caution' be used in the context of juvenile confessions by holding that Indiana law requires the use of procedural safeguards *in addition* to those required by *Miranda* when a juvenile is subjected to custodial interrogation." *Id.* (emphasis in original) (internal citations omitted) (citing *Lewis v. State,* 259 Ind. 431, 439–40, 288 N.E.2d 138, 142 (1972)). This basic concept was codified by the Indiana General Assembly, the current version of which can be found in Indiana Code section 31-

9

32-5-1 ("Juvenile Waiver Statute").[7] Like the *Miranda* warning, the Juvenile Waiver Statute was seen as necessary to safeguard a juvenile suspect's privilege against self incrimination. Here, while both parties agree that police obtained D.K.'s statements without first advising him of his rights under Indiana Code chapter 31-32-5, because D.K. was not on trial, there could have been no violation of his right against self-incrimination.

Kirk argues that his power to suppress D.K.'s statements still exists because the "plain language of [Indiana Code section 31-32-5-1] clearly grants to parents broad control over a juvenile's statements made during a custodial interrogation." *Appellant's Br.* at 17. For example, "[w]here a child has a parent but not counsel, the parent's waiver of the juvenile's rights is one of the prerequisites to admissibility of that [juvenile's] statement against the juvenile." *Id.* Even so, Kirk admits that a parent's control extends to protecting a juvenile's right against *self-incrimination*, *i.e.*, being able to prevent a juvenile's own statement from being used "against the juvenile." *Appellant's Br.* at 17. As such, Kirk cannot suppress D.K.'s statements by asserting D.K.'s privilege against self-incrimination. *See Randall v. State,* 455 N.E.2d 916, 920 (Ind. 1983) (defendant cannot claim violation of his own constitutional rights by showing violation of someone else's constitutional rights). Stated differently, Kirk does not have standing to complain that the introduction of D.K.'s statements to police violated D.K.'s privilege against self-incrimination. Thus, the trial court did not abuse its discretion in determining that D.K.'s

---

[7] Indiana Code section 31-32-5-1 in pertinent part provides that a juvenile's rights guaranteed under the federal or Indiana constitution may be waived only: 1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver; or 2) by the child's custodial parent if meaningful consultation has occurred between that person and the child, the child knowingly and voluntarily joins with the waiver, and that person has no interest adverse to the child.

10

statements were admissible at Kirk's trial, notwithstanding the fact that they were taken by police in violation of Indiana Code section 31-32-5-1.

*C.     Hearsay*

D.K.'s statements, while admissible as evidence against Kirk, must still be properly admitted. At trial, Kirk also maintained that D.K.'s statements were barred from evidence because they were inadmissible hearsay, the admission of which constituted an abuse of discretion. *Tr*. at 171. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Here, the statements of D.K. were offered to prove the truth of the assertion and as a result were hearsay.

As a general rule, hearsay is inadmissible unless the statement falls within one of the established hearsay exceptions. *Yamobi v. State,* 672 N.E.2d 1344, 1346 (Ind. 1996). At trial, the State argued that D.K.'s statements were admissible either as: (1) a statement offered against a party by that party's co-conspirator, Indiana Evidence Rule 801(d); or a statement against interest, Indiana Evidence Rule 804(b)(3). The State on appeal concedes that neither exclusion applies to D.K.'s statements. *Appellee's Br.* at 11. Instead, the State argues that the evidence was properly admitted as "impeachment evidence against D.K. as prior inconsistent statements." *Id*. at 11-12. However, while asserting that the prior inconsistent statement exception applies, the State concedes that it failed to follow the proper procedure to admit the statements as prior inconsistent statements. *Id*. at 12. The State attempts to dismiss this shortcoming by asserting that the error was harmless. "Only where we can state beyond a reasonable doubt that the

11

improperly admitted evidence did not contribute to the defendant's conviction is the error harmless." *Smith v. State*, 713 N.E.2d 338, 346 (Ind. Ct. App. 1999), *trans. denied*. As we discuss in Section V below, the introduction of D.K.'s statements was harmless as to three of Kirk's convictions; however, we find the evidence of D.K.'s statement was not harmless as to Kirk's conviction for conspiracy to commit dealing in a controlled substance.

## II.     Cell Phone Texts

Kirk next contends that the trial court abused its discretion by admitting testimony regarding the content of Kirk's text messages. Specifically, he contends that the evidence should have been suppressed because it violated the unreasonable search and seizure provisions in Article I, Section 11, of the Indiana Constitution and the Fourth Amendment to the United States Constitution, and the State failed to prove an exception to the warrant requirement to justify the warrantless search of his cell phone. We conduct a *de novo* review of a trial court's ruling on the constitutionality of a search or seizure. *Danner v. State*, 931 N.E.2d 421, 426 (Ind. Ct. App. 2010), *trans. denied*.

The Fourth Amendment to the United States Constitution ("Fourth Amendment") guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. As such it protects an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures. *Howard v. State,* 862 N.E.2d 1208, 1210 (Ind. Ct. App. 2007). This protection has been extended to the states through the Fourteenth Amendment. *Krise v. State,* 746 N.E.2d 957, 961 (Ind. 2001). A search warrant is generally a prerequisite to a constitutionally

proper search and seizure. *Halsema v. State,* 823 N.E.2d 668, 676 (Ind. 2005). When a search is conducted without a warrant, "[t]he State bears the burden of proving that a warrantless search falls within an exception to the warrant requirement." *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010). "Whether a particular warrantless search violates the guarantees of the Fourth Amendment depends on the facts and circumstances of each case." *Id.* We note that exceptions to the warrant requirement are strictly construed. *Jefferson v. State*, 780 N.E.2d 398, 404 (Ind. Ct. App. 2002).

Both parties agree that the "search incident to arrest" exception is the only exception to the warrant requirement at issue. *Appellant's Br.* at 24; *Appellee's Br.* at 14. "Under the search incident to arrest exception, police officers may search the entire person of an arrestee, including any containers found on the arrestee, incident to a lawful arrest." Chelsea Oxton, *The Search Incident to Arrest Exception Plays Catch Up: Why Police May no Longer Search Cell Phones Incident to Arrest Without Warrant*, 43 Creighton L. Rev. 1157, 1158 (2010). "In several instances, law enforcement has rummaged through a disturbing amount of personal information stored in arrestees' cell phones under the authority of the search incident to arrest exceptions, actions numerous courts have upheld." *Id.*[8] "While modern cell phones are incredible technological innovations whose proliferation has undoubtedly improved everyday life, they come with

---

[8] Citing *United States v. Finley*, 477 F.3d 250, 254, 260 (5th Cir. 2007) (describing police searching arrestee's cell phone and text messages stored therein); *United States v. Deans*, 549 F. Supp. 2d 1085, 1090, 1094 (D. Minn. 2008) (describing police searching electronic memories of two cell phones found in arrestee's vehicle); *United States v. McCray*, No. CR408-231, 2009 WL 29607, at *2 (S.D. Ga. Jan. 5, 2009) (describing police searching photo directory of arrestee's mobile phone). Chelsea Oxton, *The Search Incident to Arrest Exception Plays Catch Up: Why Police May No Longer Search Cell Phones Incident to Arrest Without A Warrant*, 43 Creighton L. Rev. 1157, 1220 (2010).

largely unexplored legal consequences." *Id*. "[A]pplying the Fourth Amendment to modern technology such as cell phones posits some fundamental questions." *Id*. "In the current digital environment, what is embodied by "papers" and "effects" under the Fourth Amendment?" *Id*. at 1158-59. "Further, what kind of Fourth Amendment protection should devices such as cell phones receive?" *Id*. at 1159. The United States Supreme Court has reminded us that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." *City of Ontario v. Quon,* ⸺ U.S. ⸺, 130 S. Ct. 2619, 2629, 177 L.Ed.2d 216 (2010). Where, like here, we can decide this issue without addressing the Fourth Amendment issue, we will do so.

Similar to the Fourth Amendment, Article I, section 11 of the Indiana Constitution ("Article I, section 11") protects citizens from unreasonable searches and seizures.[9] *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006). However, in spite of the similarity in structure of the federal and state constitutional provisions, interpretations and applications vary between them. *Id*. (citing *State v. Bulington,* 802 N.E.2d 435, 438 (Ind. 2004)). "'The Indiana Constitution has unique vitality, even where its words parallel federal language.'" *Id*. (quoting *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002)). "When we interpret language in our state constitution substantially identical to its federal

---

[9] The Fourth Amendment to the United States Constitution proclaims, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Article I, section 11 of the Indiana Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ."

counterpart, 'we may part company with the interpretation of the Supreme Court of the United States or any other court based on the text, history, and decisional law elaborating the Indiana constitutional right.'" *Id.* (quoting *Ajabu v. State,* 693 N.E.2d 921, 929 (Ind. 1998)).

Unlike the Fourth Amendment, where we focus on the defendant's reasonable expectation of privacy, under Article I, section 11, we focus on the actions of the police, concluding that the search is legitimate where it is reasonable given the totality of the circumstances. *Trimble v. State,* 842 N.E.2d 798, 803 (Ind. 2006). As we consider reasonableness based upon the particular facts of each case, we give Article I, section 11 a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy. *Rush v. State*, 881 N.E.2d 46, 52 (Ind. Ct. App. 2008).

Our determination of the reasonableness of a search or seizure under Article I, section 11 often turns on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs." *Trimble,* 842 N.E.2d at 803 (quoting *Litchfield v. State,* 824 N.E.2d 356, 361 (Ind. 2005)). It is the State's burden to prove that the search was reasonable under the totality of the circumstances. *Id.*; *Mitchell v. State,* 745 N.E.2d 775, 786 (Ind. 2001).

Here, officers responded to Barnett's 911 call that two men, one of whom was brandishing a gun, were threatening "to use that gun to beat [Barnett]." *Tr.* at 25. When officers stopped D.K. and Kirk, it was reasonable to perform a pat down search for officer safety and to search D.K. incident to arrest after finding that he was carrying a

15

loaded gun. Police then arrested Kirk for neglect of a dependent and public intoxication and, while performing a search incident to arrest, found he was in possession of marijuana, a pipe, and a cell phone. Immediately after finding Kirk's cell phone, Detective Schwomeyer opened the inbox and looked at six to eight text messages. *Tr.* at 31, 37.

By requiring the need for a warrant in order to search a cell phone, our court has recognized that the seizing of the contents of such items are deserving of protection and court oversight. *See State v. Lucas*, 859 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) (officers should have obtained search warrant for locked box just as they had done to investigate contents of cell phone), *trans. denied*; *Smith*, 713 N.E.2d at 345 (cell phones and evidence flowing therefrom should not have been admitted into evidence when State failed to justify warrantless search). The State did not make clear the reason for the search of Kirk's private cell phone. Kirk was not seen talking on his phone or even holding his phone prior to his arrest. Here, Kirk was arrested for neglect of a dependent and public intoxication; neither crime of which clearly implicated use of a cell phone.

Although Detective Schwomeyer was within his rights to confiscate the cell phone during the search incident to arrest, there was no real law enforcement need to open the cell phone, press a button to access the inbox, and read six to eight text messages. The State attempts to justify the search of the cell phone under the Indiana constitution by stating that the search intruded only a small amount into Kirk's ordinary activities and that law enforcement needs were great. On balance, we are not persuaded.

The State contends that the law enforcement needs to search the phone

16

immediately were great because the contents of the cell phone could have been remotely cleansed. The State, however, fails to prove that this was a reasonable concern or to demonstrate that less intrusive means such as removing the SIM card or simply turning the cell phone off could not have been used to block any effort to remotely cleanse the cell phone until a warrant could be obtained.

Furthermore, we find that the police actions subsequent to Kirk's arrest call into question the claim of the importance of the contents of the cell phone. Kirk's phone was seized in June 2010 and was not accessed by either party for the next three months. During that time, the property room misplaced and later found the cell phone. When Kirk's cell phone reappeared, it was in need of being charged and required a code to unlock it. The State could not obtain the code from Kirk, and yet made no effort to obtain a search warrant to again view the text messages. The State's failure to act promptly to secure the contents of the text messages suggests that the warrantless search was not motivated by concerns about the destruction of evidence. Under these facts and circumstances, we conclude that the warrantless search of the cell phone was unreasonable under Article I, Section 11 of the Indiana Constitution, and it was error for the trial court to admit the testimony regarding the contents of Kirk's cell phone.

Having found constitutional error, we must address whether that error was prejudicial to the defendant. *Stinchfield v. State,* 174 Ind. App. 423, 432, 367 N.E.2d 1150, 1155 (1977). "Only where we can state beyond a reasonable doubt that the improperly admitted evidence did not contribute to the defendant's conviction is the error harmless." *Smith*, 713 N.E.2d at 346. As we discuss in Section V below, the

17

introduction of the text messages was harmless as to three of Kirk's convictions; however, we find the evidence of the text messages was not harmless as to Kirk's conviction for conspiracy to commit dealing in a controlled substance.

### III.    Probable Cause for Search Warrant

Kirk argues that the search of his home violated his rights guaranteed under the Fourth Amendment to the United States Constitution and Article I, section 11 of the Indiana Constitution.  Specifically, Kirk maintains that the warrant was defective because it was based on D.K.'s inadmissible statements and on the illegally seized text messages found on Kirk's phone and that, without these pieces of evidence, there was no probable cause to search the home.  When a defendant challenges the propriety of a search after a completed trial, the issue before a reviewing court is whether the evidence was properly admitted.  *Casady v. State,* 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010), *trans. denied.* The standard of review is the same if either the defendant challenged the evidence by a pre-trial motion to suppress or trial objection.  *Id.*  The reviewing court is not to reweigh the evidence, and conflicting evidence is considered most favorable to the trial court's ruling, but uncontested evidence is considered favorable to the defendant.  *Id.*  In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place."  *Id.* at 1188-89.

The duty of a reviewing court is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed.  *Id.* at 1189.  While we

review the question *de novo,* we give significant deference to the issuing magistrate's determination and focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. *Id.* "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant." *Id.*

D.K. and Kirk each told the police that the North Tuxedo address was their place of residence. The trial court granted the State's request for a warrant to search Kirk's home based on Detective Schwomeyer's "Search Warrant Affidavit," the pertinent parts of which provided as follows:

> [IMPD] responded to a radio call at 822 North Tuxedo Street of a disturbance involving a gun. . . . [T]he officers spoke with the caller Dennis Barnett about an altercation that had occurred earlier in the week. Mr. Barnett stated that three . . . males had come to his home and threatened him regarding a dispute over money. Mr. Barnett also stated that one of the individuals threatened that he would return on Saturday to pistol whip Mr. Barnett if he failed to pay. During this confrontation one of the . . . male suspects brandished a handgun to back up the threat. Mr. Barnett stated that he had called the police when he saw two of the three subjects involved in the initial confrontation standing down the street from his residence. . . . Mr. Barnett believed the subjects were on foot in the area and were waiting for the police to leave before they returned to Mr. Barnett's residence. Mr. Barnett described the individuals . . . .
>
> . . . Det. Schwomeyer and Det. Mannina drove one street over and observed Ptl. Nelson and Ptl. Thomas getting out of their car to speak with two individuals that matched the description exactly of the suspects involved in the incident. . . . Det. Schwomeyer observed that the older of the two individuals had a strong odor of alcohol on his breath and his speech was slurred. Det. Schwomeyer learned that this subject[']s name was Gregory O. Kirk . . . and he was the father of the second subject who was later identified as [D.K.] . . . . Because of the nature of the incident involving a firearm and the fact that this is a high crime area where officers routinely respond to incidents involving narcotics and violent crimes[,] Ptl. Nelson completed a pat down of both individuals for weapons. Ptl. Nelson patted

19

the front of [D.K.'s] pants and immediately identified what he believed to be[,] based on his training and experience[,] a semi-automatic handgun. Ptl. Nelson withdrew the gun from the sixteen year olds pants and handed it to Det. Schwomeyer. Det. Schwomeyer cleared the weapon . . . finding it to have a round in the chamber and a full magazine . . . the gun was reported as stolen . . . . [A search incident to arrest] resulted in officers finding a baggy of white powder like substance suspected of being cocaine from [D.K.'s] right front pants pocket and a prescription pill bottle containing eighteen pills . . . with codeine phosphate, a schedule three controlled substance. . . . Det. Schwomeyer initiated a conversation with [Kirk] regarding the initial incident at Mr. Barnett's residence and he stated that he and his son had been arguing with Mr. Barnett over money that he owed them. . . . D.K. stated that he [had] been arrested and sent to juvenile before. *Det. Schwomeyer asked [D.K.] why he was out on the street with his father selling cocaine and prescription pain medication and he stated that it was because "money was tight at home." [D.K.] went on to state that there was not much food at home and that he was trying to help out the family.* While Det. Schwomeyer was speaking with [D.K.] he continuously looked at his father as if he was waiting for his father to speak up on his behalf. During this conversation [Kirk] repeatedly put his head down as if he was ashamed of what he had been caught doing with his son. Det. Schwomeyer conducted a search of [Kirk] and found . . . a cellular phone. *Det. Schwomeyer looked through the telephone's text messages and found a text message from an individual wanting to purchase marijuana and another text from an individual wanting to purchase pain pills.*

Det. Schwomeyer believes based off his training and experience as a narcotics detective that the text messages and the statements by [D.K.] show a direct conspiracy between [Kirk] and [D.K.] to deal in illegal narcotics. Det. Schwomeyer has worked over one thousand narcotics investigation [sic] that has resulted in the seizure of small and large amounts of cocaine and other controlled substances. Det. Schwomeyer has worked as a case agent, undercover, team leader, and supervisor in hundreds of cases involving two or more individuals working together for the common goal of manufacturing, packaging, and distributing illegal narcotics. Det. Schwomeyer believes that [Kirk] utilized his sixteen year old son to sell cocaine and prescription medication so that he will not get caught dealing drugs. [Kirk] supervises his son's dealings and assists his son in the collection of money when necessary. [Kirk] realizes that his son is a juvenile and will receive a lighter sentence if he is caught with illegal narcotics and/or weapons so when the two are out on the street [Kirk] has his son carry the illegal items *while he coordinates via cellular phone with potential narcotics customers*. Det. Schwomeyer believes that [Kirk] likely

20

learned the impact that a cocaine conviction could have on him during his 2001 conviction for possession of cocaine . . . .

*Appellant's App.* at 214-16.

Kirk contends that the search warrant should fail because it is based on the Affidavit of Probable Cause, which contains D.K.'s inadmissible hearsay and the contents of the illegally seized text messages. *Appellant's Br.* at 12. Assuming without deciding that it was error to base the warrant on D.K.'s statements and on the contents of the text messages, we find sufficient evidence of probable cause in the rest of the affidavit. Barnett called 911 to report that two of the three men, who had previously threatened him with a gun regarding an unpaid debt, were on Barnett's street, brandishing a gun. The police stopped Kirk and D.K.—males matching Barnett's description of the men. Because of the nature of the incident involving a firearm and the fact that the stop was made in a high crime area where officers routinely respond to incidents involving narcotics and violent crimes, the officers performed a pat-down search of both suspects. Sixteen-year-old D.K. was carrying a stolen, loaded handgun, cocaine, and eighteen pills containing codeine. Kirk told Detective Schwomeyer that "he and his son[, D.K.,] had been arguing with Mr. Barnett over money that he owed them." *Id*. at 216.

While Det. Schwomeyer was speaking with D.K. he continuously looked at his father as if he was waiting for his father to speak up on his behalf. During this conversation Kirk repeatedly put his head down as if he was ashamed of what he had been caught doing with his son. Detective Schwomeyer averred that he has worked as a case agent, undercover, team leader, and supervisor in hundreds of cases involving two or

21

more individuals working together for the common goal of manufacturing, packaging, and distributing illegal narcotics. He further stated his belief that Kirk utilized his sixteen-year-old son to sell cocaine and prescription medication so that he will not get caught dealing drugs. It was Detective Schwomeyer's opinion that Kirk supervises his son's dealings and assists his son in the collection of money when necessary. Both Kirk and D.K. gave their address as 918 North Tuxedo Street. Based upon the totality of the evidence, there was a substantial basis for concluding that probable cause existed that evidence of dealing would be found at the Tuxedo Street home. The trial court did not err in granting the search warrant or in admitting the evidence obtained pursuant to the search warrant.

### IV. Admission of Search Warrant at Trial

Kirk maintains that the trial court abused its discretion by admitting the search warrant into evidence as State's Exhibit 8. Specifically, he contends that, given the nature and quantity of the information contained in the warrant, he was prejudiced by the admission of the warrant because "[s]ome of the items authorized for seizure [were] suggestive of a major drug ring, rather than the two-person conspiracy which the State alleged." *Appellant's Br.* at 43. We review a trial court's decision concerning the admission of evidence for an abuse of discretion. *Dixon v. State*, 967 N.E.2d 1090, 1092 (Ind. Ct. App. 2012). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

Documents, such as search warrants and probable cause affidavits, often contain highly prejudicial statements. *Brown v. State,* 746 N.E.2d 63, 67 (Ind. 2001). As such,

22

"[s]earch warrants and probable cause affidavits, although potentially admissible, should be presented only to the court and not to the jury." *Grund v. State,* 671 N.E.2d 411, 417 (Ind. 1996). If the adequacy of the warrant is challenged, the State is obligated to introduce the search warrant and probable cause affidavit into evidence, but these documents should only be presented to the trial court as the issue of the warrant's validity is not an issue for the jury. *Winbush v. State,* 776 N.E.2d 1219, 1223 (Ind. Ct. App. 2002) (citing *Guajardo v. State,* 496 N.E.2d 1300, 1303 (Ind. 1986)), *trans. denied.*

Prior to trial, and again during trial, Kirk challenged the validity of the search warrant and the admission of evidence collected under the authority of the warrant. *Appellant's App.* at 187; *Tr*. at 186-87. As such, the State was obligated to introduce the search warrant to the trial court. *Winbush,* 776 N.E.2d at 1223 (citing *Guajardo,* 496 N.E.2d at 1303). However, the State was limited to presenting the issue of the warrant's validity to the trial court and not to the jury. *Id*. The record before us reveals that these strictures were followed.

Outside the presence of the jury, the State requested, and the trial court specifically agreed, that the search warrant would not be published to the jury:

> [DEFENSE COUNSEL]: In addition, I believe that a search was not admissible. It's something that involves -- it's something that can be rescinded [sic] to the Judge and brought in preliminarily, assuming its admissibility, it's not something that goes to the jury.
>
> [PROSECUTOR]: We're only offering it for the purpose to show the legal authority to enter the home. We don't intend to publish it to the jury. The only question I'm going to ask him is what would be the address, was it authorized in the search warrant and kind of go through the procedure of how a judge signed it and gave them authority to do so.

THE COURT:      Are you not going to put in what was recovered?

[PROSECUTOR]:   He kind of testifies to that.

THE COURT:      (Undecipherable)

[DEFENSE COUNSEL]:  I don't think either of them should come in. They are not going to the jury, I don't know why they can even be admitted.

[PROSECUTOR]: Because it shows legal authority to search the home.

THE COURT: Objection overruled. Show it will be admitted for that purpose.

*Tr*. at 187-88.  Here, the validity of the warrant was at issue, and the trial court allowed the State to admit the warrant for a limited purpose.  Under the facts before us, the trial court committed no error in admitting the search warrant into evidence.

### V.      Sufficiency of the Evidence

Kirk contends that the evidence presented at trial was insufficient to support his convictions.  Specifically, he contends that the State failed to prove beyond a reasonable doubt that he committed conspiracy to commit dealing in cocaine and conspiracy to commit dealing in a controlled substance.  Because Kirk asks this court to reverse his convictions, discharge his two conspiracy counts, "and remand for a new trial on the remaining counts," we also address the issue of whether there was sufficient evidence to convict Kirk of neglect of a dependent as a Class C felony and possession of marijuana as a Class A misdemeanor.

Our standard of review in sufficiency matters is well settled.  We consider only the probative evidence and reasonable inferences supporting the verdict.  *Drane v. State,* 867

24

N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence. *Id.* We will affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State,* 726 N.E.2d 268, 270 (Ind. 2000)). "The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Id.* (quoting *Pickens v. State,* 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

### A.     Neglect of a Dependent

To convict Kirk of neglect of a dependent as a Class C felony, the State was required to prove beyond a reasonable doubt that Kirk, having the care of a dependent, knowingly or intentionally placed the dependent in a situation that endangered the dependent's life or health and that the neglect is the result of a violation of Indiana Code section 35-48-4-1—dealing in cocaine or a narcotic drug. Ind. Code § 35-46-1-4. The legislature defined "dependent" to mean "an unemancipated person who is under eighteen (18) years of age." Ind. Code § 35-46-1-1. Here, the evidence revealed that D.K. was sixteen years old at the time he was arrested with Kirk. *Tr.* at 236. When asked at trial how he was related to Kirk, D.K. responded that Kirk was his "father." *Id.* at 238. Barnett testified that he saw Kirk and D.K. outside his home and thought they had come to collect an alleged drug debt. *Id.* at 93. Barnett testified that he saw D.K. pointing a handgun toward the ground, and Kirk was standing next to him. *Id.* at 93, 96-97. A search incident to arrest revealed that D.K. had a stolen, loaded, handgun tucked into his waistband, a baggie of cocaine in his front pocket, $120 in cash, and eighteen pills of acetaminophen with codeine in a pill container with the name "Richard Dodd" on

the label. *Id.* at 126-27. D.K. testified that he did not know a person named Richard Dodd. This was sufficient evidence from which the jury could have concluded that Kirk, as the father of dependent D.K., knowingly or intentionally placed D.K. in a situation that endangered his life or health and that the neglect arose in the context of collecting a debt related to dealing in cocaine.

### B. Possession of Marijuana

To obtain a conviction against Kirk for possession of marijuana, as a Class A misdemeanor, the State was required to prove beyond a reasonable doubt that Kirk knowingly possessed marijuana in an aggregate amount of 30 grams or less. Ind. Code § 35-48-4-11. Here, Detective Schwomeyer testified that when the police searched Kirk incident to his arrest, they discovered "a paper towel . . . which contained some marijuana cigarettes." *Tr.* at 23. A Laboratory Examination Report, which was introduced by stipulation of the parties, *id.* at 287, confirmed that the substance in the cigarettes was marijuana. *State's Ex.* 35. This was sufficient evidence to sustain his conviction for possession of marijuana as a Class A misdemeanor.

### C. Conspiracy to Commit Dealing in Cocaine

Kirk contends that his conviction for conspiracy to commit dealing in cocaine should be reversed because the State failed to prove an agreement between Kirk and D.K. It has long been the law that a conspiracy conviction may rest on circumstantial evidence alone, but "evidence of a mere relationship or association is not sufficient." *Washington v. State*, 807 N.E.2d 793, 797 (Ind. Ct. App. 2004) (citing *Williams v. State,* 274 Ind. 94, 95, 409 N.E.2d 571, 573 (1980)). "The circumstantial evidence or conduct of the parties

26

must be such that it supports the inference that there existed 'an intelligent and deliberate agreement between the parties' to commit the charged felony offense. *Id.* (quoting *Frias v. State,* 547 N.E.2d 809, 811 (Ind. 1989), *cert. denied*, 495 U.S. 921 (1990).

The trial court instructed the jury, without objection, that to convict Kirk of conspiracy to commit dealing in cocaine, the State had to prove beyond a reasonable doubt that Kirk: (1) agreed with D.K.; (2) to commit the felony crime of dealing in cocaine, which is to possess with intent to deliver cocaine; (3) with intent to commit the crime; and (4) D.K. performed an overt act in furtherance of the agreement by possessing cocaine. *Appellant's App.* at 245-46.[10]

Kirk's only argument as to this count is that there is insufficient evidence that he had an agreement with D.K. to deal in cocaine. Excluding from consideration the evidence of D.K.'s statements to police and the testimony regarding the cell phones texts, the following evidence was sufficient to support Kirk's conviction for conspiracy to commit dealing in cocaine.

Kirk was present on several occasions when D.K. sold cocaine to Barnett. *Tr.* at 84-85, 112. While driving Barnett to pick up money he was owed, Kirk said that Barnett owed D.K. money for drugs that Barnett had purchased. *Id.* at 114-15. Barnett heard Kirk tell D.K. that Barnett owed D.K. money for drugs and that Barnett was in possession of cocaine. *Id.* at 92-93. D.K. went to Barnett's home to collect on the debt, but came away without payment. *Id.* at 93, 106. On June 19, 2010, Barnett passed by Kirk's home

---

[10] Kirk's original appendix was returned to Kirk by the Clerk of Courts. On April 2, 2012, Kirk filed "Appellant's Amended Appendix." For ease of reference we will refer to the Amended Appendix as *Appellant's App.*

while walking home from work. Upon seeing Barnett, Kirk said, "You are going to get beat down." *Id.* at 90, 96. Later that evening, Barnett saw Kirk and D.K. across the street near his house. D.K. had a gun in his hand, which was pointed at the ground. Kirk was standing beside D.K., and the two were "talking towards [Barnett] down the street." *Id.* at 98. At trial, Barnett testified that he heard Kirk yell, "We going to get him." *Id.* at 97. Barnett testified that he assumed Kirk and D.K. were there to collect on the debt they believed Barnett owed for a prior cocaine purchase. *Id.* at 100. Barnett called 911. When police searched D.K. incident to arrest, he had cocaine and money on him. At the scene, Kirk told Detective Schwomeyer that he had been on Tuxedo Street because "the guy owed him money." *Id.* at 229. Based upon all of the above, we conclude that the State presented sufficient evidence to establish beyond a reasonable doubt that Kirk, with intent to commit dealing in cocaine, agreed with D.K. to sell cocaine, in furtherance of which both Kirk and D.K. performed the overt act of convening at Barnett's home to collect the drug debt that Kirk told D.K. he was owed. *See Stokes v. State*, 801 N.E.2d 1263, 1273-74 (Ind. Ct. App. 2004) (sufficient evidence of conspiracy to commit dealing in cocaine where, on day in question, surveillance video showed alleged co-conspirator dealing in crack cocaine, defendant counting money given to him by co-conspirator, and both sitting on porch together all day), *trans. denied*.

Here, the evidence of D.K.'s statements to police and the cell phone texts were unnecessary for the conviction, and their introduction at trial did not affect Kirk's

28

substantial rights. The error of introducing this evidence, if any, was harmless.[11]

### D. Conspiracy to Commit Dealing in a Controlled Substance

Kirk contends that his conviction for conspiracy to commit dealing in a controlled substance should be reversed because the State failed to prove that Kirk and D.K. had an agreement to deal controlled substances. We agree. Here, the only evidence that Kirk knew about the sale of pills came from D.K.'s statements and Detective Schwomeyer's testimony regarding the cell phone texts, both of which were improperly admitted evidence. This evidence was as follows.

> Detective Schwomeyer testified about his conversation with D.K. as follows:

> I asked [D.K.] why was he out here dealing cocaine and carrying a pistol, sixteen years old. His response [was] that times were tight, that he had to help out the family, said there wasn't food in the house. I asked him, you know, that doesn't give you any right to be out here, you are sixteen years old, and you have got a loaded gun, carrying a gun, selling cocaine and *selling pills*. And he said, "But I'm with my dad," which shocked me.

*Tr*. at 174. The evidence of the content of the cell phone texts came from the testimony of Detective Schwomeyer and Officer Nelson. Detective Schwomeyer testified that he recalled that one text message was from "someone requesting to purchase marijuana, and [another] one was someone requesting to purchase pain pills." *Id*. at 180. While Officer Nelson did not recall the exact language of the text messages, he recalled that they were from "people wanting to buy drugs," *i.e.*, "pills" and one other drug that Officer Nelson could not remember. *Id*. at 129.

---

[11] We further note that the benefit of introducing the text messages, if any, would have flowed to Kirk. Detective Schwomeyer testified recalling that one text message was from "someone requesting to purchase marijuana, and [another] one was someone requesting to purchase pain pills." *Tr*. at 180. This testimony would have had no probative value in proving the charge of conspiracy to commit dealing in cocaine.

29

This evidence was the only thing that proved Kirk conspired with D.K. to sell controlled substances. As discussed above, the trial court abused its discretion in admitting the evidence of D.K.'s statements and the testimony regarding the cell phone texts. Here, the error was not harmless. We therefore reverse Kirk's conviction as to the count of conspiracy to commit dealing in a controlled substance and remand to the trial court so that his sentence may be changed accordingly.

Affirmed in part, reversed in part, and remanded with instructions.

BAKER, J., and BROWN, J., concur.