**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DAWNYA G. TAYLOR**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J. T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SHANE L. DUCKWORTH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A04-1304-CR-152 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Robert J. Pigman, Judge
Cause No. 82D02-1206-FA-673

**January 17, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Shane L. Duckworth ("Duckworth") appeals after a jury trial from his conviction of one count of dealing in methamphetamine as a Class A felony,[1] contending that the trial court erred by admitting into evidence text messages that were extracted from his cell phone. We conclude that the trial court did not abuse its discretion by admitting the evidence, but even if we were to assume, *arguendo*, that the trial court erred, such error was harmless.

We affirm.

FACTS AND PROCEDURAL HISTORY

On June 18, 2012, Christopher Orman ("Orman") was at his sister's home located at 1625 B Dresden in Evansville, Indiana. Orman received a telephone call from some acquaintances asking if they could come over to visit with him. Shortly thereafter, Duckworth and Eddie Payne ("Payne") both arrived, bringing with them some methamphetamine as well as two duffel bags, each containing materials and precursors used in the manufacture of methamphetamine. Orman had allowed Duckworth and Payne to bring over the precursors, and allowed them to set up the methamphetamine lab in exchange for some methamphetamine for himself. Orman indicated that he "just told them to throw [him] some, that's a term that they use." *Tr.* at 15. When Duckworth and Payne were beginning the methamphetamine manufacturing process, Orman was in the kitchen at 1625 B Dresden, smoking some of the methamphetamine. Orman assumed that the process would be "put together" at his sister's home, but that the actual manufacture of the

---

[1] *See* Ind. Code § 35-48-4-1.1(b)(3)(B)(iii).

methamphetamine would be started somewhere else. *Id*. at 16. Because he believed that the manufacturing process would not be started there, he opened up a window to fan out the fumes. *Id*.

On that night, Officer Cara Mattingly ("Officer Mattingly") of the Evansville Police Department was working the third shift. Officer Mattingly was in the neighborhood of 1625 B Dresden when she detected "a really strong chemical smell." *Id*. at 85. Officer Mattingly had received training in the identification and detection of methamphetamine and methamphetamine labs, and in her duties encountered them on approximately thirty occasions. She described the odors she encountered on that night as "very strong," so much so that she could detect them at least two houses away from the home at 1625 B Dresden. *Id*. Eventually, she determined the residence at 1625 to be the source of the odor.

During the manufacturing process at Orman's sister's home, Duckworth decided to leave the residence to buy some "smoke bottles" from Wal-Mart. *Id*. at 16. A "smoke bottle" is a plastic soft drink or water bottle used in the last stages of the methamphetamine manufacturing process. *Id*. at 57-58. As Officer Mattingly neared the home at 1625 B Dresden, she saw, intercepted, approached, and stopped Duckworth. Other members of the Evansville Police Department also arrived on the scene. Officer Mattingly read Duckworth his *Miranda* warnings, and Duckworth consented to a search of his pockets, in which he had clear plastic tubing. Officer Mattingly immediately took the tubing into evidence.

Among the other officers who responded to the dispatch about the odor associated with methamphetamine labs was Drug Task Force member Brian Watson ("Officer

3

Watson"), Methamphetamine Suppression Unit Detective Brock Hensley ("Detective Hensley"), and Methamphetamine Suppression Unit Detective Patrick McDonald ("Detective McDonald"). Detective Hensley has encountered over 300 methamphetamine labs in his experience. He has conducted over 200 interviews and is familiar with the slang terms and language associated with methamphetamine use and manufacture. Detective McDonald has received specialized training in conducting investigations and detection of methamphetamine labs and precursors. In his experience he has investigated over 75 methamphetamine labs and has encountered precursors approximately 200 to 300 times. Officer Watson has also received drug enforcement training.

When Officer Watson arrived at the location where Officer Mattingly stopped Duckworth and recovered the plastic tubing, he also smelled what he described as a "strong chemical odor," which based upon his experience and training he associated with the manufacture of methamphetamine. *Id*. at 161. The other officers who had arrived to assist Officer Mattingly went to the back door of the house where they saw Payne exiting the house. The officers stopped him there.

Orman slammed the door to the house shut and hid inside until a SWAT team arrived. Orman then attempted to exit the house through an attic window. Orman later told officers that he tried to leave through the attic window because he was scared and knew that there was a methamphetamine lab inside the house.

Duckworth told Officer Watson during an interview that Orman had invited him over to the house to "get high." *Id*. at 162. He said that Orman had the pseudoephedrine needed to manufacture the methamphetamine. Duckworth was familiar with the

4

manufacturing process and could also smell the odors emanating from 1625 B Dresden, which were consistent with those of a methamphetamine lab.

When Orman spoke with police officers, he told them that Payne and Duckworth offered him methamphetamine in exchange for letting them manufacture methamphetamine at the house. Orman was arrested by the police and was ultimately charged with dealing and conspiracy to deal methamphetamine. Orman eventually pleaded guilty in exchange for a reduced sentence and intensive rehabilitation for addicts through drug court.

Law enforcement officers sought and obtained a search warrant for Orman's sister's home. Detective McDonald, who helped photograph and catalogue evidence from the scene, described the home at trial. In particular, Detective McDonald described the interior of the home, with its small dimensions, and all of the precursors, which were visible to any observer from any vantage point, with the exception of some of the evidence that was tucked away in the attic.

Pursuant to the warrant, the police recovered the following items: (1) a one pound container of salt; (2) a one liter plastic bottle; (3) a glass jar; (4) another, square, glass jar; (5) coffee filters; (6) a vodka bottle with a hole in the cap; (7) tubing; (8) the tubing found on Duckworth; (9) another clear plastic bottle, indicating the presence of lithium; (10) a white plastic funnel with residue; (11) a cut cold compress package; (12) a one pound container of lye; (13) a silver cap with white residue; (14) another, 2 liter bottle; (15) Coleman fuel; (16) a plug-in candle warmer; (17) a plastic pitcher; (18) lithium batteries; (19) Drano Crystal drain opener; (20) the black duffel bags Payne and Duckworth brought

5

to the house; (21) the contents of the black duffel bags, including: (21a) double-A lithium batteries; (21b) cold compress package(s); (21c) a white funnel; (21d) salt; (21e) gloves; (21f) vise grips; (22) a blender jar with white residue; (23) a measuring cup; (24) pliers; (25) gloves; (26) coffee filters; (27) a 40-count package of pseudoephedrine; and; (28) a plastic bottle. One of the mason jars found there tested positive for the presence of methamphetamine.

Detective Hensley testified that all of the evidence listed above and recovered at the house, including the tubing found on Duckworth, was indicative of a methamphetamine lab that was in the process of manufacturing methamphetamine. The evidence was indicative of the following stages, precursors, and devices in the methamphetamine manufacturing process: (1) smoke bottles; (2) reaction vessels; (3) the one-pot method; and (4) an HCL generator.

The police officers also took Duckworth's cell phone into evidence. Officer Kirk Kuester of the Vanderburgh County Sheriff's Department ("Officer Kuester"), who had received training in the investigation of cell phones and the extraction of information from cell phones, performed an extraction of information on Duckworth's cell phone. In particular, Officer Kuester conducted a logical and physical extraction of information from Duckworth's cell phone. Officer Kuester extracted a phone book, a calendar, contacts information, text messaging, phone logs, and audio/video information. He prepared a report of the text messages extracted from Duckworth's cell phone. Detective Hensley, who was familiar with the slang terminology used by manufacturers and users of

6

methamphetamine, testified at trial that Duckworth's text messages included a multitude of examples of terms for methamphetamine use and manufacture.

Officer Mattingly arrested Duckworth. Duckworth was charged with dealing in methamphetamine. After several amendments to the charging information, Duckworth's jury trial was held on January 28 and January 29, 2013. During Duckworth's trial he objected to the admission of the cell phone and to the contents of the cell phone, which were extracted by Officer Kuester. Duckworth contended that the contents were not authenticated and contained hearsay. Out of the presence of the jury, the trial court ruled that the evidence was admissible, over Duckworth's objection. At the conclusion of the jury trial, Duckworth was found guilty. Duckworth was sentenced to thirty-two years imprisonment. Duckworth now appeals.

## DISCUSSION AND DECISION

Duckworth contends that the trial court committed reversible error by admitting evidence extracted from Duckworth's cell phone.[2] The standard of review for admissibility of evidence issues is whether the trial court's decision resulted in an abuse of its discretion. *Allen v. State*, 813 N.E.2d 349, 361 (Ind. Ct. App. 2004). The decision whether to admit evidence will not be reversed absent a showing of manifest abuse of a trial court's discretion resulting in the denial of a fair trial. *Id.* Generally, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial

---

[2] We would be remiss not to acknowledge the constitutional dimension of the search and seizure aspect of the cell phone extraction process challenged here on appeal. For a discussion of our analysis of that issue, please see *Kirk v. State*, 974 N.E.2d 1059, 1069-70 (Ind. Ct. App. 2012). Because that issue is not presented for our review, we do not address it.

7

rights of a party. *Id.* In determining whether an evidentiary ruling affected a party's substantial rights, the court assesses the probable impact of the evidence on the trier of fact. *Id.*

The primary basis for Duckworth's objection to the admission of the evidence extracted from his cell phone is that it was comprised of hearsay evidence. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible unless it falls within one of the exceptions found in the evidence rules. Evid. R. 802. Additionally, the same statement offered for another purpose is not hearsay. *Grund v. State*, 671 N.E.2d 411, 415 (Ind. 1996).

The text messages recovered from the cellphone that had been received by Duckworth were admitted to show the identity of the recipient and person responding to the text messages. The trial court allowed the admission of those text messages for that purposes. Because the texts were admitted for another purpose, to establish the identity of the recipient and responder, and not to prove the truth of the contents of the text messages, the text messages were not excludable as inadmissible hearsay. As for the text messages sent by Duckworth, those were correctly admitted as statements made by a party opponent. Evid. R. 801(d)(2)(A)&(B).

Next, we address the authentication issues presented in this appeal. In *Hape v. State*, 903 N.E.2d 977 (Ind. Ct. App. 2009), we stated the following with respect to the authentication of cellular phone evidence:

8

> Before the cellular telephones were admitted into evidence, a police officer testified about how the items seized from Hape, which included the telephones, were catalogued and tracked. The officer identified the exhibit on the record, and testified that he had personally initialed the seals across the top and side of the bag. The State presented sufficient evidence to authenticate that the cellular telephones were the telephones retrieved from Hape, and their admission into evidence did not constitute error.

903 N.E.2d at 990. Like in *Hape*, here, the officers recovered the cell phone from Duckworth, testified as to how the evidence was recovered and catalogued, identifying all of the exhibits including the cell phone itself. The officers testified that the text messages which were extracted were from the cell phone recovered from Duckworth. Duckworth did not object to the admission of the cell phone.

> We further stated in *Hape* as follows:

> We agreed with the State that "the authentication requirement [of Indiana Evidence Rule 901(a)] is satisfied by a showing that the images contained in the exhibits were recovered from [the defendant's] computer." Requiring "testimony before the trial court . . . sufficient to establish the authenticity of the exhibits as depicting the images contained in [the defendant's] computer equipment," we indicated that authentication of the data saved in a computer is a condition precedent to the admission of the data recordings. We see no reason why the writings or recordings generated and saved inside of a cellular telephone should be exempted from the same authentication requirement.

*Id.* at 990 (internal citations omitted).

Officer Kuester testified about the manner in which the text messages were recovered, the standard method of operation for conducting the extractions, both logical and physical, and that Officer Kuester had received extensive training in each of the methods of extraction. Therefore, there was ample evidence to support the admission of the evidence in question.

9

Assuming, *arguendo*, that the trial court erred by admitting the evidence at issue, such would constitute harmless error. There was sufficient other evidence to establish Duckworth's familiarity with the manufacturing process of methamphetamine, Duckworth's possession of materials used for the same, and that Duckworth brought in a duffel bag full of precursors used in the manufacture of methamphetamine. The use of slang drug terms in text messages, is cumulative of evidence already properly admitted in evidence. We find no reversible error here.

Affirmed.

RILEY, J., and ROBB, J., concur.