## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 28 2020, 10:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan M. Gardner
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Darron T. Carter, *Appellant-Defendant,* | July 28, 2020 |
| v. | Court of Appeals Case No. 19A-CR-2669 |
| | Appeal from the Allen Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Wendy W. Davis, Judge |
| | Trial Court Cause No. 02D04-1808-F2-40 |

**Baker, Judge.**

[1] Darron Carter appeals his convictions and sentence for Level 2 Felony Dealing in Heroin,[1] Level 3 Felony Dealing in Cocaine,[2] Class A Misdemeanor Carrying a Handgun Without a License,[3] Class A Misdemeanor Resisting Law Enforcement,[4] Class B Misdemeanor Possession of Marijuana,[5] and Class C Misdemeanor Operating a Vehicle by an Unlicensed Driver.[6] He argues that (1) the trial court erred by allowing Carter to proceed pro se because he did not properly waive his right to counsel; (2) the trial court erred by excluding as evidence the probable cause affidavit accompanying Carter's charges; and (3) his sentence was inappropriate in light of the nature of the offenses and his character. Finding no error and the sentence not inappropriate, we affirm.

## Facts

[2] On August 13, 2018, Fort Wayne Police Officer Douglas Weaver was patrolling around the north side of Fort Wayne. He observed a black Nissan with a temporary license plate, ran the plate, and learned that the plate was registered to a Ford and had expired on July 1, 2018. Officer Weaver turned on his emergency lights and attempted to initiate a traffic stop, but the Nissan kept

---

[1] Ind. Code § 35-48-4-1(e).

[2] I.C. § 35-38-4-1(d).

[3] Ind. Code § 35-47-2-1.

[4] Ind. Code § 35-44.1-3-1.

[5] I.C. § 35-48-4-11.

[6] Ind. Code § 9-24-18-1.

driving and turned down another road. Officer Weaver continued following and observed the driver lean over his center console, causing the officer to "fear that the subject driving the vehicle was either attempting to get a weapon or conceal an item." Tr. Vol. I p. 227. Officer Weaver then activated his siren and the vehicle eventually slowed to a stop.

[3] When Officer Weaver approached the car, he saw Carter in the driver's seat and one passenger in the front passenger seat. When asked for his driver's license, Carter stated he did not have one and instead presented a state identification. Carter also told the officer that he was driving the passenger to the hospital, but the officer had observed him driving in the opposite direction. Throughout the interaction, Carter "wouldn't make eye contact with [Officer Weaver], appeared to be speaking quickly," and appeared nervous, to the point where "his hands were visibly shaking." *Id.* at 230. After he confirmed Carter's identity, Officer Weaver also observed that the temporary license plate on the Nissan had been altered with marker to change the expiration date to August 21.

[4] Next, Officer Weaver ordered Carter to exit the vehicle and conducted a pat-down search. During the pat-down search, Officer Weaver felt a hard object in Carter's groin area "that [he] immediately recognized and believed to be a barrel of a gun." *Id.* at 233. Carter then tensed his body in a way that prevented the officer from removing the object. Officer Weaver motioned for another

officer to come assist him,[7] and despite Carter continuing to tense up and refusing to comply with orders, the two officers eventually handcuffed him. Once handcuffed, Carter tried reaching into his pants, so the officers moved him to the ground to limit his movement. Officers again tried to retrieve the object, but Carter "began to forcibly and violently buck his body" and resist the officers, continuing to try and reach for the object in his shorts. *Id.* at 235. Officers struck Carter in the upper back and sprayed pepper spray before Carter finally complied and allowed officers to remove the object.

[5] The object removed from Carter's underwear was a Taurus nine-millimeter handgun with a round in the chamber and a fully loaded magazine. Officers also recovered a sock holding multiple bags, which contained substances later determined to be 21.08 grams of heroin, 3.3 grams of cocaine, and a small amount of marijuana. Officers also discovered a "very thick wadding of money" in Carter's pocket, tr. vol. II p. 41, and a plastic baggy with "a large amount of US currency in it" in the glovebox of the Nissan, tr. vol. I p. 245.

[6] On August 17, 2018, the State charged Carter with Level 2 felony dealing in cocaine or narcotic drug, Level 5 felony carrying a handgun without a license, Class A misdemeanor resisting law enforcement, Class A misdemeanor possession of a firearm by a domestic batterer, Class B misdemeanor possession

---

[7] At some point between the initiation of the traffic stop and the pat-down search, a second officer had arrived on the scene. A third officer arrived once Carter had been moved to the ground and was thrashing and resisting officers' efforts to remove the object from his pants.

of marijuana, and Class C misdemeanor operation of a motor vehicle by an unlicensed driver. On January 2, 2019, the State filed a motion to add one count of Level 3 felony dealing in cocaine or narcotic drug, and the trial court granted the motion on January 4, 2019.

[7] Carter failed to appear for pretrial conferences on each of December 18, 2018, January 11, 2019, and January 22, 2019. On July 26, 2019, he was eventually brought into court in custody based on a warrant for his failure to appear. At that hearing, Carter requested a fast and speedy trial, which was scheduled for September 25-26, 2019.

[8] On September 9, 2019, Carter's attorney filed a motion to withdraw as counsel, citing an "irretrievable breakdown" in the attorney-client relationship. Appellant's App. Vol. II p. 87. At a hearing on September 12, 2019, Carter requested to proceed pro se; the trial court granted his request and granted counsel's motion to withdraw. At the hearing, the trial court reviewed for Carter the charges against him, some of the possible penalties, and the numerous benefits of having an attorney as opposed to proceeding pro se. Tr. Vol. I p. 22-23. After doing so, the conversation between the trial court and Carter proceeded, in relevant part, as follows:

> THE COURT: . . . What skills and knowledge do you have that would be helpful to you if you represent yourself? Have you been in the system? Have you had prior cases?
>
> CARTER: Yes Your Honor.

THE COURT: All right. So do you feel like you have the skills and knowledge to represent yourself?

CARTER: Um no, but I do understand that [my former attorney is] an attorney that I hired. He's not working for me.

THE COURT: We are talking—you made a request under the sixth amendment to represent yourself. I want to address that. Do you still want to move forward with representing yourself?

CARTER: Yes.

THE COURT: So do you feel, let me ask you this again, that you can do this, and you have the skills and knowledge to do this?

CARTER: I don't feel like. I feel like I'm forced in it.

THE COURT: Feel what?

CARTER: I'm forced.

THE COURT: Nope. Nobody is forcing you. You hired [counsel]—are you hired?

[FORMER COUNSEL]: I am Your Honor.

CARTER: Yes.

THE COURT: All right. So you hired [counsel]. He is now withdrawing from that case. Do you understand that, and you want him to withdraw from the case?

CARTER: That was his decision so . . .

THE COURT: No. You have filed in this case a motion for ineffective assistance of counsel so I am hearing from your lawyer that there has been a breakdown in communication?

CARTER: Yes.

THE COURT: I have to rule this morning on your motion—well, you filed it pro se, but you are represented, but we are in the midst of whatever we are doing this morning.

CARTER: I would like to proceed pro se.

THE COURT: Are you sure?

CARTER: Yes. I am very positive.

THE COURT: You are going to go in front of a jury, and I am going to ask you again . . .

CARTER: I'm positive.

\*\*\*

THE COURT: So do you feel like you can do that? You have the skills and knowledge to do that?

CARTER: Like I said like . . .

THE COURT: You've got to speak up real loud.

CARTER: I do not feel like that. Like I said, you asked me a question. I'm giving you the honest truth.

THE COURT: Then why in the world would you represent yourself?

CARTER: Because the attorney is not doing nothing for me.

THE COURT: Are you going to hire—would you like to hire another attorney?

CARTER: Not if it is going to affect my jury trial.

THE COURT: Not what?

CARTER: Not if it is going to affect the date of my jury trial.

THE COURT: Well, typically when a hired lawyer withdraws, and I haven't agreed to the motion yet, but I will tell you that you would have to have a lawyer up to speed and ready for jury trial on that date. You are incarcerated right now. If you want to stay at the Allen County Jail for—I'm setting new trial dates, if you were to get a new lawyer, and I would set new trial dates, I am into February. You would stay incarcerated until that time if that's what you want to do? I just need you to understand what is happening this morning.

CARTER: I understand.

THE COURT: All right. So do you still want to proceed pro se . . .

CARTER: Yes.

THE COURT: Or do you want to hire a lawyer?

CARTER: I'm proceeding pro se.

*Id.* at 23-26.

[9] The trial court then continued asking Carter questions relating to his ability to represent himself. Carter stated that he had been involved in a jury trial in the past, he had never studied criminal law, he attended high school until twelfth grade but never graduated nor received a GED,[8] and he is able to read and write but cannot "become familiar quickly with the rules and procedures and use them right away in a pressure situation like at trial." *Id.* at 27. When asked if he felt like he was a "good speaker" and could "represent himself," Carter replied, "No. Not really." *Id.* At the end of this exchange, Carter again repeated to the judge that he wished to represent himself and proceed pro se, and the trial court permitted him to do so. *Id.* at 28.

[10] On September 23, 2019, the State dismissed the charge of possession of a firearm by a domestic batterer. At the conclusion of the jury trial held September 25-26, 2019, the jury found Carter guilty of all charges. A sentencing hearing was held October 18, 2019. At two points during the sentencing hearing, Carter made a request for counsel to assist him with that hearing, and

---

[8] Although Carter told the trial court that he had not received his GED, the information he reported in the presentence investigation shows that he did, in fact, receive his GED in 2010, and even went on to attend Ivy Tech Community College for ten months in 2014. Appellant's App. Vol. III p. 107.

the trial court denied the request. The trial court sentenced Carter to an aggregate term of twenty-three years with three years suspended. Carter now appeals.

# Discussion and Decision

Carter makes three arguments on appeal: (1) the trial court erred by allowing Carter to proceed pro se because he did not voluntarily waive his right to counsel; (2) the trial court erred by excluding as evidence the probable cause affidavit accompanying Carter's charges; and (3) his sentence was inappropriate in light of the nature of the offenses and his character.

# I. Waiver of Right to Counsel

The Sixth Amendment to the United States Constitution protects the fundamental right to a fair trial, including the right to counsel.[9] *Poynter v. State*, 749 N.E.2d 1122, 1125 (Ind. 2001). Implied within the right to counsel is the right to self-representation. *Drake v. State*, 895 N.E.2d 389, 392 (Ind. Ct. App. 2008). "In recognition that the 'average defendant does not have the professional legal skills to protect himself' at trial, it is required that a defendant's choice to appear without professional counsel be made intelligently." *Poynter*, 749 N.E.2d at 1126 (quoting *Johnson v. Zerbst*, 304 U.S.

---

[9] The State correctly notes that Carter also cites to the Indiana Constitution's right to counsel provision, yet provides no independent argument or analysis under the state constitution. As such, any right to counsel claim under the Indiana Constitution is waived, and we conduct our analysis only with regards to the protections provided by the Sixth Amendment. *E.g.*, *Holloway v. State*, 69 N.E.3d 924, 931 (Ind. Ct. App. 2017).

458, 462-64 (1938)). Therefore, when a defendant chooses to proceed pro se and waives his right to counsel, the trial court should ensure that he is "made aware of the dangers and disadvantages of self-representation." *Faretta v. California*, 422 U.S. 806, 835 (1975).

[13]   There are no specifically prescribed set of questions the trial court must ask a defendant or specific information it must provide or solicit in advising a defendant on the risks of self-representation; rather, the trial court "need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver." *Poynter*, 749 N.E.2d at 1126. In *Poynter*, our Supreme Court adopted four factors for a reviewing court to consider when determining whether a waiver of counsel was done so knowingly, intelligently, and voluntarily: "(1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed pro se." *Id.* at 1127-28. "Waiver of the right to assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Taylor v. State*, 944 N.E.2d 84, 89 (Ind. Ct. App. 2011).

[14]   Because a trial court is best positioned to evaluate whether a defendant has made a knowing and intelligent waiver of the right to counsel, its finding on the matter will "most likely be upheld where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned

conclusion." *Drake*, 895 N.E.2d at 393 (internal quotations omitted). Regardless, on appeal, the trial court's determination that a defendant validly waived the right to counsel is reviewed de novo. *A.A.Q. v. State*, 958 N.E.2d 808, 812 (Ind. Ct. App. 2011).

[15] First, we note that the trial court did, in fact, hold a formal and sufficiently thorough inquiry into Carter's decision to proceed pro se.[10] The trial court questioned Carter about his prior involvement with the courts, his education, his comfort with public speaking, his ability to learn and research applicable rules and procedures, and his reading and writing skills. The trial court also reviewed the charges against Carter, the myriad of skills and expertise attorneys possess and the functions they perform prior to and during trial, and the potential consequences of opting to proceed pro se. The trial court warned that "deciding not to have an attorney can turn out to be a very bad decision if you are not careful" and that even experienced lawyers "almost always . . . decide[] to be represented by another lawyer." Tr. Vol. I p. 24. The trial court did not restate the specific penalties associated with Carter's charges, but it confirmed that Carter understood "the range of punishment that applies" and noted that

---

[10] Carter does not actually challenge the adequacy of the trial court's advisements and inquiry into his decision to proceed pro se; rather, he primarily contends that the decision to represent himself "was not done so voluntarily." Appellant's Br. p. 13. Nonetheless, because the determination of whether a waiver of counsel depends on a balance of all four of the factors outlined in *Poynter* and the larger context of the decision to proceed pro se, we briefly review the content of the advisements.

there "are legal factors that may increase or decrease the sentence from the advisory sentence." *Id.*

[16] Next, we do not find anything else in the record that would suggest Carter did not understand the dangers or disadvantages of self-representation. In addition to the oral advisements and inquiries, the trial court also provided Carter a written advisement for self-represented defendants, the contents of which largely mirrored the points already covered by the trial court in its conversation with Carter at the hearing. *See* Appellant's App. Vol. II p. 105-06. After the series of questions and warnings the trial court provided to Carter, it went on to state that his responses throughout the hearing showed he was "very intelligent" and "articulate." Tr. Vol. I p. 30-31.

[17] Third, with regards to Carter's background and experience, he told the trial court that he completed the twelfth grade, can read and write, and had been involved in a jury trial in the past. We note that Carter informed the trial court that he did not feel that he could quickly learn the applicable rules and procedures and use them at his upcoming trial, and also repeatedly made statements conveying that he lacked confidence in his ability to represent himself. *See* Tr. Vol. I p. 23-27. But there is nothing more in the record suggesting Carter may not have had the mental capacity or competence to voluntarily or knowingly waive the right to counsel. *See, e.g.*, *Faretta*, 422 U.S. at 836 (stating that a defendant's "technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself").

[18] Lastly, and most importantly in this case, we look to the context in which Carter made his decision to proceed pro se. Here, Carter's decision was motivated solely by the desire to preserve his jury trial dates and because he felt "forced" to proceed pro se if he wanted to keep those trial dates. Tr. Vol. I p. 24. His attorney withdrew, and Carter requested to proceed pro se, on September 12, 2019, and the jury trial was set for two weeks later, on September 25-26, 2019. When asked if he wanted to hire a new attorney, Carter specifically stated that he did not want to if doing so would affect the date of his jury trial, and the trial court confirmed that it would not be rescheduled until at least February if new counsel was retained. *Id.* at 26-27. When Carter told the trial court that he felt "forced" into his decision, the trial court explained that "nobody is forcing you." *Id.* at 24. Carter nevertheless insisted that because his attorney decided to withdraw and because he wanted to maintain his trial dates, he wanted to proceed pro se.

[19] Generally, "[i]f a defendant's decision to proceed without counsel appears tactical, then this factor weighs in favor of finding a knowing and intelligent waiver." *Drake*, 895 N.E.2d at 395 (citing *Poynter*, 749 N.E.2d at 1128 n.6). However, if the decision is tactical or strategic in nature but is made "without the benefit of having all of the pitfalls and dangers of self-representation explained" or some even "minimal effort by the trial court" to make sure a defendant knows the risks involved with such a decision, then it may weigh against finding a knowing and voluntary waiver. *Miller v. State*, 789 N.E.2d 32, 38 (Ind. Ct. App. 2003). Here, wanting to preserve a speedy trial date could be

considered strategic, but as previously noted, the trial court adequately and thoroughly warned Carter about the various advantages of hiring new counsel.

[20] Further, in *Wirthlin v. State*, the defendant, like Carter, wanted to proceed pro se because his "primary concern was the speed at which he could get . . . matters resolved," believing that "the only way to get the charges resolved quickly was to proceed pro se." 99 N.E.3d 699, 705-06 (Ind. Ct. App. 2018). The defendant also expressed much "confusion and uncertainty" throughout the conversation with the trial court on his decision to represent himself. *Id.* at 706. As a result, this Court found that Wirthlin's waiver was not made knowingly, intelligently, or voluntarily, and we specifically emphasized that Wirthlin had never made an unequivocal statement that he wanted to represent himself and that the trial court, when Wirthlin expressed confusion and uncertainty, did not then "take the time to probe his thought process and guide him." *Id.* In Carter's case, however, although he was uncertain about his abilities to represent himself and said he felt forced to do so to preserve his speedy trial dates, he unequivocally stated he wanted to proceed pro se, and repeated that sentiment multiple times throughout the series of warnings and information the trial court provided him.

[21] In sum, we find that the balance of the four *Poynter* factors weighs in favor of a voluntary waiver of the right to counsel. Despite Carter stating that he felt "forced" into the decision, the trial court clarified for him that he was not, asked him multiple times if he wanted an attorney, listed numerous tasks an attorney typically performs, warned that Carter would not be given any special treatment if he were pro se, and cautioned that even experienced attorneys

would not choose self-representation. But even amidst these myriad warnings and questioning from the trial court on Carter's decision to represent himself, and amidst statements Carter made in which he firmly doubted his abilities to represent himself effectively, he still stated—repeatedly and firmly—the express, unequivocal desire to proceed pro se. As such, the trial court properly determined that Carter made a voluntary, knowing, and intelligent waiver and provided ample information to Carter such that he "made the decision with his . . . 'eyes open.'" *Drake*, 895 N.E.2d at 397 (quoting *Osbourne v. State*, 754 N.E.2d 916, 920-21 (Ind. 2001)).

## II. Probable Cause Affidavit

[22] Next, Carter argues that the trial court committed reversible error when it excluded from the evidence the probable cause affidavit filed with his charges. The admission or exclusion of evidence is within the trial court's sound discretion and is given great deference on appeal. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). We will reverse a trial court's ruling on the admission or exclusion of evidence only if the decision is clearly against the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. *Id.*

[23] At trial, during Carter's cross-examination of Officer Weaver, Carter sought to introduce into evidence a copy of the probable cause affidavit accompanying his charges. The State objected on the basis that it was inadmissible hearsay and

the trial court sustained the objection, telling Carter that he was "welcome to utilize it to cross examine him, but it can't go into evidence." Tr. Vol. II p. 11.[11]

[24] Carter argues that the affidavit falls under an exception to the rule against hearsay under Indiana Evidence Rule 803(8)(B)(i), which provides an exception for "investigative reports by police and other law enforcement personnel . . . when offered by an accused in a criminal case." But this Court has previously held that a probable cause affidavit constitutes inadmissible hearsay under this rule because the document, rather than being a true investigative report, is prepared "for advocacy purposes or in anticipation of litigation"—that is, the "primary purposes" of probable cause affidavits are "to set forth the facts upon which an arrest was made so that the court can determine the lawfulness of the arrest and to provide the State with information needed to bring charges against the accused." *Rhone v. State*, 825 N.E.2d 1277, 1284 (Ind. Ct. App. 2005). Because of these underlying purposes, probable cause affidavits "often contain highly prejudicial statements," *Kirk v. State*, 974 N.E.2d 1059, 1074 (Ind. Ct. App. 2012), designed to persuade judicial officers that an arrest was justified, *Rhone*, 825 N.E.2d at 1284. Therefore, the facts presented in a probable cause affidavit pose the type of risk of unreliability that the rule against hearsay is

---

[11] As an initial matter, the State argues that Carter waived this issue because he failed to make a proper offer of proof demonstrating the affidavit's relevance and grounds for admissibility, thereby failing to preserve the exclusion issue for appellate review. *See Guillen v. State*, 829 N.E.2d 142, 145 (Ind. Ct. App. 2005). We agree that Carter failed to make the proper offer of proof after the trial court excluded the evidence, *see* tr. vol. II p. 11-12, but in the interest of resolving issues on the merits, we opt to briefly review it here.

designed to protect against. *Tate v. State*, 835 N.E.2d 499, 509 (Ind. Ct. App. 2005).

[25] In light of the above, we conclude that the trial court properly excluded the probable cause affidavit from evidence. Furthermore, although Carter claims the exclusion prevented him from using the affidavit for impeachment purposes, the trial court still permitted him to read the relevant portion of the affidavit into the record for that purpose. *See* Tr. Vol. II p. 11-12. Carter read aloud a statement regarding Officer Weaver's observation of a large bulge of cash in Carter's pocket, and Officer Weaver confirmed that he made that statement in the affidavit. Carter has failed to show that the remainder of the probable cause affidavit should have been introduced for any other purpose.

## III. Sentence Appropriateness

[26] Lastly, Carter argues that the sentence imposed by the trial court was inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that this Court may revise a statutorily authorized sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In conducting this review, "substantial deference" must be given to the trial court's decision, "since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting

*Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[27] Carter was convicted of Level 2 felony dealing in heroin, Level 3 felony dealing in cocaine, Class A misdemeanor carrying a handgun without a license, Class A misdemeanor resisting law enforcement, Class B misdemeanor possession of marijuana, and Class C misdemeanor operating a vehicle by an unlicensed driver. For a Level 2 felony, Carter faced a term of ten to thirty years, with an advisory sentence of seventeen and one-half years. Ind. Code § 35-50-2-4.5. For a Level 3 felony, he faced a term of six to twenty years, with an advisory sentence of ten years. I.C. § 35-50-2-5. For each Class A misdemeanor, he faced a term of up to a year; for a Class B misdemeanor, up to 180 days; and for a Class C misdemeanor, up to 60 days. I.C. §§ 35-50-3-2, -3, -4. The trial court sentenced Carter to twenty-three years for dealing in heroin, with three years suspended, and concurrent sentences on the remaining counts.

[28] With respect to the nature of the offenses, we agree with the State that the offenses were "particularly egregious." Appellee's Br. p. 19. Carter attempted to retrieve his hidden gun while resisting law enforcement, and refused to cooperate with orders to the point where he was "forcibly and violently buck[ing] his body" even after being placed on the ground. Tr. Vol. I p. 234. Officers resorted to striking him in the back and then spraying pepper spray before Carter finally stopped resisting. He also lied about having anything hidden in his pants when asked by officers, even though the officers had already felt the barrel of the gun in the groin area. *See id.* at 233. We also note that the

amount of drugs recovered from Carter—21.08 grams of heroin and 3.3 grams of cocaine, along with a large sum of money—was particularly large, and amounted to more than double the amount of heroin needed to support the dealing charge. *See* I.C. § 35-48-4-1(e).

[29] With respect to Carter's character, we first and foremost take note of his extensive criminal history, which includes seven prior misdemeanor convictions and four prior felony convictions, three of which are for prior drug related offenses.[12] Outside of Indiana, he has been arrested for receiving stolen property, criminal mischief, driving without proof of insurance, and robbery. *See Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007) (holding that we may consider a defendant's history of arrests as a reflection of his character). Following some of these prior convictions, he had suspended sentences revoked three times, had probation revoked once, and was terminated from a reentry program. Carter also has a significant history of abusing substances including alcohol, marijuana, cocaine, and synthetic marijuana, yet has never sought treatment. And in the last five years, Carter has not been gainfully employed except for one position at a barbershop for several months in 2017.

[30] Carter presents no other evidence showing good character that would render his sentence inappropriate. He notes that he has two dependents who rely on him

---

[12] Carter emphasizes that he has "only" three prior drug-related convictions, and that the rest of his previous convictions were unrelated to the present offenses—seemingly suggesting that this criminal history, in the aggregate, actually demonstrates his good character such that a sentence revision is warranted. Appellant's Br. p. 18. Simply put, we disagree.

for support, and also argues that the imposed sentence leaves him "little to no opportunity to engage in any rehabilitative programs" upon his release, even though he has an extensive drug abuse problem that began when he was sixteen. Appellant's Br. p. 20. But to the contrary, his extensive criminal history—especially the fact that he has already been convicted of multiple drug-related offenses, has had probation and suspended sentences revoked, and has yet to seek any kind of rehabilitation—instead shows a blatant disinterest in changing his behavior or prioritizing the needs of his dependents.

In sum, we do not find the sentence imposed by the trial court to be inappropriate in light of the nature of the offenses or Carter's character.

The judgment of the trial court is affirmed.

Bradford, C.J., and Pyle, J., concur.